ESTATE OF JAMES H. MATTHEWS, FIDELITY TRUST COMPANY, EXECUTOR, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 112390. Promulgated March 28, 1944.

*W. A. Seifert, Esq., Norman D. Keller, Esq.,* and *A. G. Wallerstedt, C. P. A.,* for the petitioner.

*J. Harrison Miller, Esq.,* for the respondent.

Smith, *Judge*: This proceeding involves an estate tax deficiency of $21,009.01, all of which is in controversy. The questions for our determination are:

(1) The valuation, for estate tax purposes, of certain corporate shares which decedent owned at the time of his death but which under the terms of an existing agreement a business associate had an option to purchase within a stated period at a stipulated price.

(2) Whether the proceeds of the policies of insurance on decedent's life which were paid to a creditor bank to whom decedent had assigned the policies as collateral security on his promissory note are includible in decedent's gross estate without the benefit of the statutory exemption of $40,000 as "amounts receivable by the executor" within the meaning of section 302 (g) of the Revenue Act of 1926. In the alternative the respondent contends that, if the amount of insurance paid to the creditor bank is subject to the $40,000 exemption, then the total amount of such insurance should include the proceeds of two group insurance policies on decedent's life, one of which was contributory and one noncontributory.

(3) Whether there should be included in the gross estate the value of the corpus of a trust which decedent created in 1922, reserving the right to receive the income for life, after the death of his wife, and a contingent power of testamentary disposition over a portion of the corpus.

The evidentiary facts are all contained in a written stipulation of facts and exhibits which the parties filed at the hearing. We find the facts therein contained as stipulated. The facts pertinent to the several issues are set out separately below.

The written stipulation submitted by the parties also contains a settlement of other matters pertaining to the estate tax liability of the estate which will be given effect in the recomputation under Rule 50.

#### FINDINGS OF FACT.

The decedent, James H. Matthews, died testate a resident of Pittsburgh, Pennsylvania, on November 23, 1938. His executor, petitioner herein, duly filed an estate tax return on behalf of his estate with the collector of internal revenue at Pittsburgh. The executor elected in the return to value the property in the gross estate as of the date of decedent's death.

*Issue 1.—Valuation of Stock Subject to Option Agreement.*

Findings of Fact.—At the time of his death, and for a number of prior years, decedent was president and a large stockholder of Jas. H. Matthews & Co., a Pennsylvania corporation. On October 12, 1934, decedent entered into a written contract under seal with an-

other officer and stockholder of the corporation, William Jenkins, whereby reciprocal options were given for the survivor of them, within a limited time after the death of the other, to purchase from the estate of the deceased all the shares of stock of Jas. H. Matthews & Co. which might be owned by the deceased at the time of his death, with certain exceptions not here material. The agreement provides in part as follows:

FIRST, The said JAMES H. MATTHEWS agrees for himself, his heirs, executors or administrators, that in the event of his death before that of the said WILLIAM JENKINS then the said WILLIAM JENKINS shall have the exclusive option or privilege of purchasing from the heirs, executors or administrators of the Estate of the said JAMES H. MATTHEWS, at the price hereinafter set forth, all or any part of the capital stock of said Corporation owned by the said JAMES H. MATTHEWS at the time of his death with the exception of five hundred (500) shares thereof disposed of by Will.

SECOND. The said WILLIAM JENKINS agrees for himself, his heirs, executors or administrators, that in the event of his death before that of the said JAMES H. MATTHEWS then the said JAMES H. MATTHEWS shall have the option or privilege of purchasing from the heirs, executors or administrators of the Estate of the said WILLIAM JENKINS, at the price hereinafter set forth, all or any part of the capital stock of said Corporation owned by the said WILLIAM JENKINS at the time of his death with the exception of two hundred (200) shares thereof disposed of by Will.

THIRD. The price to be paid by the survivor of the parties hereto for the said capital stock owned by the one who first dies shall be the sum of SEVENTY-FIVE ($75.00) DOLLARS per share if purchased within three (3) months of the other party's death, provided a dividend shall have been paid prior thereto by the Corporation from the proceeds of life insurance carried by the Corporation on the life of said decedent; otherwise the survivor may purchase said capital stock owned by the other, within six (6) months of death, by paying the price of NINETY ($90.00) DOLLARS per share therefor.

By an amendment to the agreement made December 20, 1935, the exemption of the 500 shares referred to as disposed of by the decedent in his will was removed.

Decedent was the owner at the time of his death of 785 shares of Jas. H. Matthews & Co. stock. In his will he referred to his agreements with Jenkins relating to such stock and provided that "In making disposition of this stock, I direct that my executor, hereinafter named, be guided by the terms of these agreements." No dividend from the proceeds of the life insurance carried by Jas. H. Matthews & Co. on the life of the decedent was paid within three months after the decedent's death. Pursuant to the terms of the option agreement the 785 shares were sold by decedent's executor to Jenkins at the price of $90 per share. In decedent's estate tax return the 785 shares of Jas. H. Matthews & Co. stock which he owned at the time of his death were valued at $90 per share, or at a total value of $70,650. The respondent has determined in his deficiency notice that the fair market value of the stock at the date of decedent's death was $120 per share, or a total of $94,200.

The fair market value of the 785 shares of Jas. H. Matthews & Co. stock which decedent owned at the date of his death was $120 per share.

OPINION.—The respondent contends that the shares in question which decedent owned at the time of his death must be included in his gross estate under section 302 of the Revenue Act of 1926 at their fair market value at the date of decedent's death, which he has determined was $120 per share. Petitioner contends that the option price of $90 per share at which William Jenkins had the right to purchase the stock from the decedent's estate must be taken as the measure of the fair market value.

This question was recently considered by this Court in *Claire Giannini Hoffman*, 2 T. C. 1160. There, a decedent during his lifetime had given his brother an option to acquire, upon his death, whatever interest he might then have in a securities business operated as a partnership and in certain notes of the nominal partners, upon the payment of the balance then due on a promissory note of the decedent and the payment to his estate of a sum equal to 20 percent of the value of the assets of the partnership. We held that the fair market value of the property at the date of decedent's death and not the option price was the measure of the value at which it should be included in the gross estate. The restrictions there imposed upon the property by the option agreement did not become effective until the decedent's death and did not affect its value until after his death. That was the situation in the present case. The option agreement was to apply only to the stock which might be owned by the decedent at the time of his death and decedent was under no obligation to retain ownership of any of the shares until his death. He was free up to the very moment of his death to sell or otherwise dispose of the shares for the best price obtainable. That right terminated with and by reason of his death. Likewise the right of the optionee to purchase the shares came into existence at the time of and by reason of decedent's death.

The instant case, like the *Hoffman* case, is distinguishable from the cases relied upon by the petitioner, such as *Wilson* v. *Bowers*, 57 Fed. (2d) 682; *Lomb* v. *Sugden*, 82 Fed. (2d) 166, and *Edith M. Bensel et al., Executors*, 36 B. T. A. 246; affd., 100 Fed. (2d) 639. In all of those cases the option agreement, or other restriction on the sale of the property, became effective during the lifetime of the decedent and the value of the property was not affected by his death. In *Lomb* v. *Sugden, supra*, for instance, the court said:

* * * Because of the agreement, the decedent could not have secured a price greater than $69.445 at the time of her death. It is as of that time that the value of the stock must be determined. Then she could only give it or sell it to the other stockholders at the price fixed. Its value to the estate

can be no greater than that with which the decedent parted. *Edwards* v. *Slocum*, 264 U. S. 61, 63.

Since the agreement between decedent and Jenkins did not pass to either of them any present rights or interest in the shares owned by the other, but merely gave to each a right of claim to an interest in the shares which the other might own at his death, it was testamentary in character. See *Hydrick* v. *Hydrick*, 142 S. C. 531; 141 S. E. 156; *Hartford-Connecticut Trust Co.* v. *Divine*, 97 Conn. 193; 116 Atl. 239. In this connection it should be noted that the decedent provided in his will that the shares in question should be disposed of by his executor in accordance with the terms of the agreement with Jenkins.

Decedent retained the full ownership of and interest in his shares until his death and that interest ceased by reason of his death. See *Edwards* v. *Slocum*, 264 U. S. 61. See also *Klein* v. *United States*, 283 U. S. 231.

The respondent has determined that the shares in question had a fair market value at the date of decedent's death, independently of the option agreement, of $120 per share, and the petitioner has offered no evidence to the contrary. The respondent's determination is therefore sustained.

*Issue 2.—Proceeds of Insurance Policies Paid to Decedent's Creditor.*

FINDINGS OF FACT.—The decedent on September 23, 1935, and June 30, 1937, respectively, created two separate insurance trusts, one for the benefit of his two granddaughters and the other for the benefit of his daughter and her husband. Under the trust agreements he designated the trustee, Fidelity Trust Co. of Pittsburgh, beneficiary of ten policies of insurance on his life of an aggregate face amount of $56,100. The decedent reserved the right at any time to amend or revoke the trusts and to withdraw any of the policies from the trusts without the consent of the trustee or the beneficiaries of the trusts.

On October 18, 1938, decedent assigned eight of the policies above mentioned, of an aggregate face value of $51,000, to the Union National Bank of Pittsburgh as collateral security for his indebtedness, both present and future, to the bank. At that time decedent was indebted to the bank on his promissory note for $29,000. Separate written assignments were made for each of the eight policies, containing the following provisions:

It is expressly agreed as follows:

(1) This assignment is made and the policy is to be held as collateral security for all direct and indirect liabilities (hereinafter called indebtedness) of

the insured to the bank, due or to become due or that may hereafter be contracted.

(2) The bank shall nave the sole right, without notice to or assent by the insured or beneficiary to surrender the policy and to receive its cash value to the amount of the indebtedness of the insured to the bank, except that the bank shall have no right to surrender said policy prior to its lapse. The bank shall have the sole right at any time to withdraw dividends credited to sand policy, and, generally, without limitation, to exercise any right, privilege or option given in said policy, except the right to change the beneficiary designation, such right, if any, to change the beneficiary from time to time, subject always to the assignment, being reserved to the insured.

(3) The bank shall have the sole right to collect from the Insurance Company the net proceeds of the policy. when it becomes a claim by death or maturity to the amount of the indebtedness of the insured to the bank, and the bank shall also have the right to collect any disability income, to the extent of the indebtedness of the insured to the bank, unless this right is waived by the bank in writing.

(4) The bank shall have the sole right at any time, without notice to or assent by the insured or beneficiary, to secure a loan or loans on the policy for any purpose whatsoever to the amount of the insured's indebtedness to the bank, and to pledge the policy as security for such loan or loans.

(5) A statement of the indebtedness of the insured to the bank, sworn to by an officer of the bank, shall be conclusive proof of the existence and amount of such indebtedness, and the Insurance Company is hereby authorized and directed to rely upon such statement and to pay to the bank the sum due to it under and by virtue of this assignment by check drawn to the sole order of the bank. The sole receipt of the bank for any sum or sums paid to it by the Insurance Company by virtue of this assignment shall be a full discharge and release of the Insurance Company for the sum or sums so paid, and the Insurance Company shall not be responsible for the proper application by the bank of any part of the sum or sums so paid to it.

(6) The bank shall apply all sums received by it at any time from the Insurance Company upon the indebtedness secured by this assignment.

(7) No party interested in said policy shall, on account of the application of any of the proceeds of said policy on said indebtedness, have the right to contribution or reimbursement from any party or to be subrogated to the rights of the bank in any other collateral. The insured and the beneficiary agree that without notice to either and without affecting the liability of either hereunder, the bank may apply the proceeds of the policy hereby assigned to the indebtedness for which this assignment is given as security without first resorting to other collateral; may take other collateral or release part or all of any other collateral held as security for said indebtedness; may release any party primarily or secondarily liable for such indebtedness or grant extensions, renewals or indulgences with respect to such indebtedness.

(8) The insured will deliver to the bank receipts for the payment of premiums on said policy at least ten days prior to the expiration of the period of grace permitted by the policy for the payment of premiums.

(9) The bank shall not be liable for the payment of any premium on said policy, but if the bank does pay any such premium, the amount so advanced shall become a part of the indebtedness secured by this assignment, shall be due immediately, and shall bear interest at the same rate as the principal of said indebtedness.

(10) Any power herein given to the bank is to be exercised only at its

option, and it shall in no way be liable for any failure to collect sums payable under said policy, or to exercise any of the rights, privileges or options under said policy, or to take any other affirmative action in connection with said policy.

(11) Upon payment to the bank of all the indebtedness of the insured to the bank, the bank will release all its interest in and under said policy.

(12) The undersigned guarantee the validity and sufficiency of this assignment and their title to said policy will forever warrant and defend.

It is hereby declared that no proceedings in bankruptcy are pending against the maker or makers of this assignment.

The assignments and the trusts referred to above were in force and effect at the time of decedent's death. Shortly after decedent's death and pursuant to the terms of the assignments, the insurance companies paid to the assignee bank out of the proceeds of the pledged policies $29,000, the full amount of decedent's indebtedness to the bank. They paid the balance of the proceeds of the policies, amounting to $29,950.14, plus the proceeds of the two group policies which were not assigned, to the trustee beneficiary.

To compensate the trusts for the amount of the insurance proceeds paid to the assignee bank, the decedent's executor gave the trustee two demand notes dated January 4, 1939, one for $8,487.28 and one for $20,512.72. The $8,487.28 note was held by the Fidelity Trust Co. until payment thereof. The note for $20,512.72 was distributed to decedent's daughter and her husband as a distribution in liquidation of the trust of which they were beneficiaries and thereafter was endorsed by them to William Jenkins.

The Fidelity Trust Co., as executor of decedent's estate, filed a first and final account and a supplement thereto with the Orphans' Court of Allegheny County, Pennsylvania, during 1939, which were approved as filed.

There was included in decedent's estate tax return $55,085.74 representing the total amount of proceeds paid on all of the above insurance policies, except that portion of the proceeds from the participating policy which was attributable to the premiums paid by Jas. H. Matthews & Co., amounting to $2,264.40, and all of the proceeds of the nonparticipating policy, amounting to $1,600. From the gross amount so reported, $58,950.14, there was deducted the statutory exemption of $40,000. leaving net taxable proceeds of $15,085.74. The respondent determined in his deficiency notice that the $29,000 paid to the Union National Bank of Pittsburgh in satisfaction of decedent's indebtedness was "receivable by the executor" within the meaning of section 302 (g) of the Revenue Act of 1926 and was therefore includible in the gross estate in its entirety, and that only that portion of the proceeds which was "receivable by all other beneficiaries," $29,950.14, was subject to the statutory exemption.

OPINION.—Section 302 (g) of the Revenue Act of 1926, as amended by section 404 of the 1934 Act, provides for the inclusion in the gross estate of all property:

(g) To the extent of the amount receivable by the executor as insurance under policies taken out by the decedent upon his own life; and to the extent of the excess over $40,000 of the amount receivable by all other beneficiaries as insurance under policies taken out by the decedent upon his own life.

Article 26, Regulations 80, as amended by Treasury Decision 5032, Cumulative Bulletin 1941-1, p. 427, provides that:

*Insurance in favor of the estate.*—The statute requires the inclusion in the gross estate of all insurance receivable by the executor or administrator or payable to the decedent's estate, and all insurance which is in fact receivable by, or for the benefit of, the estate. It includes insurance effected to provide funds to meet the estate tax, and any other taxes, debts, or charges which are enforceable against the estate. * * *

Our first question is whether section 302 (g) above requires the inclusion in the gross estate of the $29,000 of insurance proceeds which was paid to the Union National Bank of Pittsburgh in satisfaction of decedent's indebtedness to the bank. The statute has been construed as requiring the inclusion of such amounts for estate tax purposes in a number of cases decided by this Court. See *Pacific National Bank of Seattle, Executor*, 40 B. T. A. 128; *Estate of Waldo Rohnert*, 40 B. T. A. 1319; *Mathilde B. Hooper, Administratrix*, 41 B. T. A. 114; *Estate of Silas B. Mason*, 43 B. T. A. 813; *Estate of Henry William Hofferbert*, 46 B. T. A. 1101.

In *Estate of Silas B. Mason, supra*, we said that:

* * * The proceeds of policies of insurance taken out by a decedent upon his own life which in terms are payable to a beneficiary other than the decedent's "executor," but which are required to be used, and are in fact used, to satisfy debts of decedent or his estate, should be treated as being receivable by the decedent's "executor" within the meaning of subsection (g) and should be included in the decedent's gross estate. * * * even though decedent irrevocably assigned the policies to the beneficiary, and did not reserve to himself the power to borrow on the policies or to receive the cash surrender value thereof or "to exercise any of the incidents of ownership therein." *Mathilde B. Hooper, Administratrix, supra.*

Petitioner contends that all of the above cited cases, with the possible exception of *Estate of Henry William Hofferbert*, are distinguishable on the facts. It contends that the *Hofferbert* case is erroneous if construed as denying the right of a beneficiary, such as the trustee here, to recover from the insured's estate the full value of the proceeds of insurance policies pledged for the payment of a debt of the insured. The argument is made that the trustee, on being named the beneficiary of the policies, acquired an interest in them which became vested at the time of decedent's death and that the assignment

of the policies to the bank by the decedent was not intended and did not operate as a divestment of those rights.

Petitioner further argues that, notwithstanding the assignment of the policies to the bank as collateral on decedent's note, liability for payment of the note after decedent's death rested upon the executor and that the trustee as beneficiary of the policies was "legally entitled to be subrogated to the creditor and to recover back from the estate the amount used to discharge the debt."

No question is raised in this proceeding as to the right of the estate to deduct the $29,000 indebtedness to the bank as a claim against the estate. In the absence of any evidence to the contrary we shall assume that the respondent has made such an allowance, consistent with his determination that the $29,000 of insurance proceeds were used to pay a valid indebtedness of the estate.

The rights, as between the named beneficiary and the assignee or creditor of the insured, in the proceeds of life insurance policies on the life of the insured is a question upon which there has been much litigation, and the rulings of the courts are not uniform. In some states it is held that the beneficiary's rights are superior to those of the assignee and the creditors. See *Anderson* v. *Broad Street Nat. Bank*, 90 N. J. Eq. 78; 105 Atl. 599; *Tyler* v. *Treasurer and Receiver General*, 226 Mass. 306; 115 N. E. 300; *Atlantic Mut. Life Ins. Co.* v. *Gannon*, 179 Mass. 291: 60 N. E. 933; *Schoenholz* v. *New York Life Ins. Co.*, 234 N. Y. 24: 136 N. E. 227; *Katz* v. *Ohio Nat. Bank*, 127 Ohio St. 531; 191 N. E. 782.

In *Katz* v. *Ohio Nat. Bank*, *supra*, the contest was between the beneficiary and the executor of the insured's estate. The court said:

> While there is considerable authority for the proposition that the assignment of a policy of insurance invests the assignee with the legal title thereto, which amounts to a change of beneficiary, authority to the contrary is abundant, and we prefer to align ourselves with this latter view. The cases comprising the first class mentioned fail to distinguish between "assignment," which depends wholly upon contract, and "change of beneficiary," which is the exercise of the power to appoint. 7 Cooley's Briefs on Insurance, 6443; 22 Ohio Jurisprudence, 395.

In other states the rights of the beneficiary are said to be subordinate to those of an assignee creditor. See *Barbin* v. *Moore*, 85 N. H. 362; 159 Atl. 409; *Antley* v. *New York Life Ins. Co.*, 139 S. C. 23; 137 S. E. 199; *Missouri State Life Ins. Co.* v. *California State Bank*, 202 Mo. App. 347; 216 S. W. 785; *Taylor* v. *Southern Bank & Trust Co.*, 227 Ala. 562; 151 So. 357; *Potter* v. *Northwestern Mut. Life Ins. Co.*, 216 Ia. 799; 247 N. W. 669.

The Federal cases favor the latter rule. See *Malone* v. *Cohn*, 236 Fed. 882; *Mutual Ben. Life Ins. Co.* v. *Swett*, 222 Fed. 200; *Aetna Life Ins. Co.* v. *Phillips*, 69 Fed. (2d) 901; *Rawls* v. *Penn Mut. Life Ins. Co.*,

253 Fed. 725. In upholding the rights of the assignee, the court said in *Rawls* v. *Penn Mut. Life Ins. Co., supra:*

While admitting the right of the insured to change at will the beneficiary, she denies his right to create a lien on the policies without her consent. It would seem that the greater right included the lesser. If the insured could have changed the beneficiary to another person, or even to his own estate, he could have assigned or incumbered the policies to secure a loan. An assignment, in fact, to secure a debt greater than the face of the policies, would have been, in effect, a change in the beneficiary, which the policies specifically give the insured the right to make. The beneficiary could not complain if her rights had been entirely blotted out by such an assignment, and she should not be heard to complain when her rights are only partially affected by the act of the insured. * * *

Pointing out this lack of uniformity in the decisions, the court said in *Lemley* v. *McClure*, 185 Atl. 878:

The Pennsylvania cases, however, are entirely harmonious in holding that the interest of a beneficiary, where the right is reserved in the policy to make a change, is not vested, but is merely an expectancy, *Knoche, Adm'r.* v. *Mutual Life Ins. Co.*, 317 Pa. 370, 176 A. 230; *Fidelity Trust Co.* v. *Travelers' Ins. Co.*, 320 Pa. 161, 181 A. 594; and that an assignment for security differs from an absolute transfer, *Sommer* v. *New England Mut. Life Ins. Co.*, 21 Pa. Super. 501.

We think the better reasoning supports the rule that, where a policyholder reserves the right to change the beneficiary, his assignee has a right to the proceeds in preference to the nonjoining beneficiary. This view gives the insured control over his own property in which the beneficiary has only an inchoate right, and that right dependent entirely upon the will of the insured. Whatever interest the beneficiary may have, he or she is not completely deprived thereof by an assignment, but is subject to the right of the creditor until the debt is paid. To require an insured to change the beneficiary, or to obtain the beneficiary's consent, when he wishes to pledge his policy for a loan, would most likely result in having the insured designate his estate as the beneficiary, so that a loan, with a policy as security, could be quickly and conveniently consummated. To hold to the contrary would, in many instances, be to the detriment of beneficiaries. The conclusion we have reached is recognized and supported by the leading textwriters. See 2 Cooley's Briefs on Insurance (2d Ed.) 1805: 6 Couch, Cyc. of Insurance Law, §§ 5233, 5234; 37 C. J. 581; 14 R. C. L. 998; Note, 60 A. L. R. 191. Several law review articles have taken a similar position: Vance, "The Beneficiary's Interest in a Life Insurance Policy"; 31 Yale L. J. 343; Note, 73 U. of Pa. L. Rev. 295: 32 Col. L. Rev. 1071; 11 N. C. L. Rev. 169.

It seems to be the generally accepted rule in most states that the interest of the named beneficiary, although a mere expectancy where the insured has the right to change the beneficiary, becomes vested upon the death of the insured and that where the insured assigns the policy as collateral security for his debt the assignment does not divest the named beneficiary's vested interest, but merely subjects it to the assignee's lien. *Katz* v. *Ohio Nat. Bank, supra; Clark* v. *Equitable Life Assur. Soc.*, 133 Fed. 816; *Russell* v. *Owen.* 203 N. C. 262; 165 S. E. 687; *Barbin* v. *Moore, supra; Mercer Nat. Bank of Harrodsburg* v. *White's Executor*, 236 Ky. 128; 32 S. W. (2d) 734; *Coleman* v.

*Anderson* (Tex. Civ. App.), 82 S. W. 1057; *Oetting* v. *Sparks*, 109 Ohio St. 94; 143 N. E. 184. That appears to be the law in the Commonwealth of Pennsylvania. See *Weil* v. *Marquis*, 256 Pa. 608; 101 Atl. 70.

In *Fidelity Trust Co.* v. *Union Nat. Bank of Pittsburgh*, 313 Pa. 467; 169 Atl. 209, the insured while solvent created an insurance trust for the benefit of his wife and children, assigning to the trustees a number of policies of insurance on his life and naming the trustees beneficiaries. By a supplemental agreement with the trustees and a creditor bank to which he was indebted for $200,000, the insured directed the trustees, upon his death, to pay off the indebtedness to the bank out of the proceeds of the policies. At that time the insured was insolvent. After his death a dispute arose over the proceeds of the policies. In its opinion the court said:

> We must also reject the contention that the Ohio Bank transaction is within the statutory exemption saving family insurance from creditors (e. g., Act of June 28, 1923, P. L. 884 [40 PS § 517]). The right of the wife and children to participate in the insurance was an expectancy measured by the policies and the insurance trust agreements. One of the conditions of the donor's gift was that, by the exercise of power expressly reserved, he might destroy altogether the expectancy of his wife and children. By the Ohio Bank agreement, he diminished the contingent beneficial interest theretofore conferred on his family, and subordinated that interest in the insurance proceeds to the extent of the loan and interest.
>
> The situation, presented by the Ohio Bank agreement, was this: In the collateral, the donor had an equity, the value of which depended on whether he paid the note, or if the collateral was foreclosed, whether it realized more than the debt. As the bank held the collateral at the time of the donor's death, that equity then passed to his personal representatives. The collateral was afterward sold by the bank for less than the debt, the equity had no value to the estate and ceased to be an element in the problem with which we are now dealing. * * * The Ohio Bank agreement was a conveyance, to the bank, of an interest in the proceeds expected to come into the hands of the trustees; the value of the right was the face of the note with interest. Though it turned out that the bank did not realize on the conveyance, the failure to obtain the value which the donor had carved out of what was once an expectancy provided for his family alone, did not revest that interest in the family. It remained where it was, an asset of the donor, which on his death passed to his personal representatives in such amount as the bank might have claimed. * * *

*Barbin* v. *Moore, supra*, one of the three cases strongly relied upon by the petitioner here, is a New York case. It was there held that, where the assignee of an insurance policy which was held with other collateral as security for a debt took satisfaction for the debt out of the proceeds of the policy, the named beneficiaries of the policy were subordinated to the rights of the assignee, but had a valid claim against the insured's estate for the amount of the insurance proceeds. In reaching that conclusion the court pointed out that there was

nothing in the evidence to indicate that the insured intended for the debt to be paid out of the insurance; that the beneficiaries' vested rights in the entire proceeds of the policies, which became vested upon the insured's death, had never been cut off by the insured through the exercise of his power to change the beneficiary; and that the policies were pledged merely as "additional collateral" for the debt and were not subject to primary liability.  As to the beneficiaries' right to subordination, the court said that the crucial question was:

\* \* \* How far did the insured transfer title to the insurance by the pledge to the bank? As to the bank, or its vendee standing in its right, the transfer was complete.  The vendee would own the right to receive seventy-seven hundred odd dollars of the insurance at Leclerc's death.  Could the beneficiaries recover. from the insured the present value of their right in that item? That depends upon whether, as between him and them, it was his duty to pay the debt, or otherwise provide for the release of the policies.  If he owed them that duty they could recover; and if he did not they would be without remedy.

Did he pledge his property or theirs? Did he exercise a right to make the property his, thus far, or merely a power to dispose of theirs? If the latter was what he did, their right would be clear.  But if the former course was taken, it does not necessarily follow that he would owe them no duty.  There would still be a further inquiry to answer, as suggested above.  How much of the title did he appropriate? If what he did evidences a purpose to make the insurance his own only as far as to furnish security to the bank, leaving the title in every other respect perfect (though defeasible) in the beneficiaries, the duty to protect the security would still be owed to them, and they could recover. \* \* \*

The court said, however, that:

\* \* \* Not only could the insured have provided that the insurance should be used to pay the debt existing at his decease by making the bank the designated beneficiary to the extent of its claim against the estate, *but a mere direction in the pledge to resort to the insurance first would have answered the purpose of expressing the alleged design.* \* \* \* [Italics supplied.]

That comment of the court is particularly significant here because the pledge of the policies did contain the very provision which the court referred to as lacking in that case.  In the instant case the written assignment shows that decedent must have intended the debt to be paid out of the proceeds of the assigned policies.  The assignee bank was given substantial rights and powers in the policies, including the right to borrow on them to the extent of the amount of the debt and to collect the amount of any indebtedness which the decedent might owe to it at the time of his death out of the proceeds of the policies, without notice to the decedent.  In fact, under the broad provisions of the assignment the bank acquired rights and powers almost equal to those of the insured, except the right to change the named beneficiary.  There was no other collateral deposited with the bank on the indebtedness.

In *Katz* v. *Ohio Nat. Bank*, *supra*, another of the three cases strongly relied upon by petitioner here, the same result was reached as in *Barbin* v. *Moore*, *supra*, but upon somewhat different reasoning. The court stated that, although there was considerable authority to the contrary, the rule in Ohio was that the assignment of a policy as collateral security for a debt of the insured was not the equivalent of a change of beneficiary and did not divest the beneficiary of legal title to the proceeds. *Oetting* v. *Sparks*, *supra*, an earlier Ohio case in which a different result was reached, was distinguished on factual grounds.

The third case upon which petitioner relies in support of the beneficiary's right of subrogation is *Russell* v. *Owen*, *supra*, a North Carolina case. In concluding its opinion in that case the court said:

The policies were assigned by the insured and the beneficiary, jointly, to the Equitable Life Assurance Society, as additional security for bonds executed by the insured as principal, and the beneficiary as surety. These bonds were also secured by deeds of trust on lands owned by the insured. After the death of the insured, the bonds were paid out of the proceeds of the policies of insurance. Thus the property of the surety, with her consent, was applied to the payment of the bonds on which the insured was liable as principal. By reason of these facts, the defendant Violet Russell Owen became a creditor of the estate of her husband, plaintiff's intestate, in the amount due on the bonds, and paid out of her property, to wit, $7,269.93. As such creditor, she is entitled to be subrogated to all the rights of the Equitable Life Assurance Society under the deeds of trust which Delagnier S. Owen had executed to convey the bonds secured thereby. C. S. § 3964, and cases cited.

No case has been cited, and we find none, in which the courts of Pennsylvania have ruled that the named beneficiary of an insurance policy, the proceeds of which have been paid to the insured's creditor under an assignment of the policy as collateral security for a debt, is entitled to recover the amount of the proceeds so applied from the assets of the insured's estate, by right of subrogation or otherwise.

We do not think that the cases relied upon by petitioner support the contention that the $29,000 of the proceeds of the assigned policies which was paid to and retained by the creditor bank in payment of decedent's debt was the property of the trustee beneficiary and therefore not "receivable by the executor as insurance" within the meaning of section 302 (g) of the taxing act. On the evidence in this case we think that the assignment to the creditor bank amounted to a conveyance to the bank of a property right in the policies to the extent of decedent's indebtedness to the bank at the time of his death. To that extent the transfer was as effective as if decedent in the exercise of his reserved power to change the beneficiary at any time had named the creditor bank beneficiary of the policies. Cf. *Rawls* v. *Penn Mut. Life Ins. Co.*, *supra*.

There is nothing whatever in the evidence before us to indicate that decedent intended that the beneficiary trustee should have an indefeasible right to the full amount of the proceeds of the policies. On the other hand, in establishing the trusts he expressly reserved the right:

* * * at all times to exercise and to enjoy all rights, options and privileges reserved to him in the insurance policies and to withdraw any policy from the operation of this agreement without the consent or joinder of the Trustee or of any beneficiary hereunder. * * *

But even if it should be conceded that the beneficiary of the assigned policies had a valid claim against decedent's estate, by right of subrogation or otherwise, for the amount of the proceeds of the policies which was paid to the creditor bank, it would not follow that that portion of the proceeds was not "received by, or for the benefit of, the estate" within the meaning of the Commissioner's regulations. The statute makes due allowance for the deduction of claims against the estate in determining the net taxable estate, and, as pointed out above, it is not shown or claimed that decedent's indebtedness to the bank was not deducted in full.

Although our earlier cases, and particularly that of *Estate of Henry William Hofferbert, supra,* are perhaps authority for the conclusion which we have reached in this case, we have reviewed the entire question in deference to petitioner's insistence that the *Hofferbert* case, if not distinguishable on its facts—and we do not think that it is— was erroneously decided because it failed to give consideration to the effect of the so-called "subrogation" principle relied upon in *Barbin* v. *Moore, supra, Katz* v. *Ohio Nat. Bank, supra,* and *Russell* v. *Owen, supra.*

On the facts in this case and upon consideration of the cases relied upon by petitioner, and other cases noted, we conclude that the entire amount of the proceeds of the policies which were paid to the creditor bank on decedent's indebtedness must be included in the gross estate.

In view of our ruling on this question, it is not necessary to pass upon the question as to whether, or to what extent, the proceeds of the two group insurance policies are includible in decedent's gross estate. The total amount of the proceeds received from all of the policies on decedent's life, after the elimination of the $29,000 paid to the creditor bank, was less than the $40,000 statutory exemption.

## Issue 3.—Trust Created Prior to March 3, 1931.

FINDINGS OF FACT.—On April 13, 1922, decedent created a trust with the Fidelity Title & Trust Co., trustee, the income of which was to be paid to his wife for life and after her death, if he should be living, to himself for life, and after the death of the survivor of them to his daughter for life. In the event that the daughter should

be one of the two last surviving beneficiaries the trust corpus was to be disposed of by the daughter in her will, or upon failure of such appointment was to be distributed by her executor or administrator according to law. If both decedent and his wife should survive the daughter, each of them was to have the right to dispose of one-half of the corpus by will.

The decedent's wife died in 1935 and thereafter during decedent's lifetime he received the income of the trust. Decedent's daughter was still living at the time of his death in 1938 and thus acquired the right to the income of the trust for her life, plus the right previously acquired upon her mother's death to dispose of the corpus by her will.

The respondent included the corpus of the trust in question in decedent's gross estate at a valuation of $100,075.45. It is stipulated, however, that the fair market value thereof at the time of decedent's death was $86,742.41.

OPINION.—The respondent contends that the corpus of the trust is includible in the gross estate under section 302 (c) of the Revenue Act of 1926, as amended by the Joint Resolution of March 3, 1931, and section 803 (a) of the Revenue Act of 1932, as a transfer intended to take effect in possession and enjoyment at or after death; first, because of the power reserved by the donor to himself and his wife to dispose of the trust corpus by will, in case the decedent's daughter should predecease them, and, second, because of the right which decedent reserved to receive the income from the trust for his life, following the death of his wife.

We do not think that any of the trust corpus is includible in decedent's gross estate for either of the reasons advanced by the respondent.

At the time of decedent's death he had no rights whatever in the disposition of any of the trust corpus. It was only in the event his daughter should predecease him and his wife that he was to have the power to dispose of one-half, or any part of the trust corpus. After the death of decedent's wife in 1935 the surviving daughter had the complete power of disposal over all of the corpus. The cases relied upon by respondent, *Helvering* v. *Hallock,* 309 U. S. 106, and *Klein* v. *United States,* 283 U. S. 231, have no application here.

Decedent's reservation of the right to the income of the trust for life, following the death of his wife, does not require the inclusion of the trust corpus in his gross estate under section 302 (c) of the 1926 Act, as amended by section 803 (a) of the 1932 Act, for the reason that the trust was created prior to the effective date of the amendment. *May* v. *Heiner,* 281 U. S. 238; *Hassett* v. *Welch,* 303 U. S. 303; *Estate of Edward E. Bradley,* 1 T. C. 518.

Reviewed by the Court.

*Decision will be entered under Rule 50.*