Estate of Harry W. Hammond, Deceased, Citizens National Trust and Savings Bank of Riverside, Trustee of the Harry W. Hammond Trust v. Commissioner.
Estate of Hammond v. Commissioner
Docket No. 45705.
United States Tax Court
T.C. Memo 1955-25; 1955 Tax Ct. Memo LEXIS 310; 14 T.C.M. (CCH) 83; T.C.M. (RIA) 55025; January 31, 1955
*310 Walter L. Nossaman, Esq., 900 Wilshire Boulevard, Los Angeles, Calif., Joseph D. Brady, Esq., and James L. Wood, Esq., for the petitioner. Donald P. Chehock, Esq., for the respondent. WITHEY
Supplemental Memorandum Findings of Fact and Opinion WITHEY, Judge: The respondent determined a deficiency of $136,979.94 in the estate tax of the estate of Harry W. Hammond, deceased. Issues presented by the pleadings are (1) whether the respondent erred in determining that the fair market value as of the appropriate optional valuation date, or dates, of 662 1/4 shares of stock in Riverside Daily Press, held at the time of the decedent's death in a trust of which he was grantor, was $900 per share, (2) whether respondent erred in failing to determine that the optional valuation date as to 39 of said shares was November 17, 1948, and not July 3, 1949, and in failing to determine that the value of the 39 shares under the optional valuation method was $200 per share, the price at which they were sold on November 17, 1948, (3) whether respondent erred in failing to determine that the fair market value of the remaining 623 1/4 shares on July 3, 1949, was not in excess of $236.45 *311 per share, the value at which they were reported in the Federal estate tax return filed for the decedent's estate, (4) in the alternative, whether respondent erred in failing to determine that the value of the 662 1/4 shares was not in excess of $302.64 per share, the value determined by him in the determination of a deficiency of $13,635.55 against petitioner in 1950 and which petitioner subsequently paid, (5) in the alternative, whether the respondent, having induced petitioner to pay the deficiency of $13,635.55 on the representation that after consideration of all relevant factors and elements of value he had determined the value of the stock to be $302.64 per share, is now estopped to assert that he failed in the performance of the duty of determining value imposed on him by the Internal Revenue Code, and (6) whether the respondent erred in failing to allow a deduction for certain expenses which have been and will be incurred in contesting the deficiency asserted in the deficiency notice with respect to which the petition giving rise to the instant proceeding was filed. Our report in the proceeding was filed on September 29, 1954. Respecting issues (1), (2), (3) and (4), supra, *312 we held that the value of the 39 shares of stock in Riverside Daily Press mentioned in issue (2) was not to be determined as of a different date and in a different amount per share from the date and amount applicable to the remaining 623 1/4 shares mentioned in issue (3) and that the value at the time of the decedent's death of the total 662 1/4 shares mentioned in issues (1) and (4) was $550 per share. In view of the statement in petitioner's opening brief that it did not ask us to hold that respondent's determination of a value of $302.64 per share for the stock was legally final and binding on him, we concluded that it was unnecessary to decide issue (5), supra. Issue (6), supra, was left for disposition under Rules 50 and 51. By a motion, granted simultaneously herewith, the petitioner has asked for a reconsideration of the findings and holdings respecting the 39 shares of stock in Riverside Daily Press as set out in the report filed September 29, 1954. No request is made for a reconsideration of our findings and holdings with respect to the remaining 623 1/4 shares of stock in Riverside Daily Press or with respect to any of the other issues involved. Supplemental Findings *313 of Fact In addition to the additional facts found upon a reconsideration of the matters covered in petitioner's motion, there are set out herein some other facts which have been found heretofore and which are pertinent to a consideration of the matters being reconsidered. Harry W. Hammond, sometimes hereinafter referred to as the decedent, died intestate on July 3, 1948. His entire estate, except a jointly held bank account, was left in trust. The trustee of the trust, Citizens National Trust and Savings Bank of Riverside (California), filed the Federal estate tax return for decedent's estate and elected to have the gross estate of decedent valued in accordance with values as of a date, or dates, subsequent to the decedent's death, as provided in section 811(j) of the Internal Revenue Code of 1939. The gross estate as reported in the Federal estate tax return included 662 1/4 shares of stock in Riverside Daily Press, sometimes hereinafter referred to as Press. Press is a California corporation formed in 1922 with an authorized capital stock of 1,500 shares of a par value of $100 each, all of which were issued. Press' principal place of business is, and has been, at Riverside, *314 California. Prior to 1932 Press published a newspaper known as the "Press" and the Riverside Enterprise Corporation published another paper known as the "Enterprise." The stock of Riverside Enterprise Corporation was owned one-half by Press and one-half by Sun Company of San Bernardino. During 1932 there was a merger of Riverside Enterprise Corporation and Press, and, following the merger, Harry W. Hammond owned 550.833 of the 1,500 shares of Press, Maude T. Hammond, his wife, owned 6.169 shares, and Howard H. Hays owned 35.253 shares. The remainder was owned by Sun Company of San Bernardino and four individuals in amounts varying from 13.22 shares to 308.466 shares. At or about the time of the merger Hammond agreed to assist Hays in acquiring the stock of other stockholders so that the Hammond and Hays' interests would be equal. Prior to 1935 Hammond was business manager of Press. During 1935 he became its president and continued as such until his death on July 3, 1948, at which time he also was treasurer. Hays became vice-president of Press in 1935 and continued as such until Hammond's death, after which he became president and treasurer. During the early 1930's, Hammond and Hays *315 became directors of Press. Hays has continued to be a director and Hammond continued as a director until his death. Both prior to and after the death of Hammond there was an understanding between the members of the Hays family and the members of the Hammond family that they would maintain equal interests in Press, and that if additional shares of the corporation became available, they would be purchased in equal amounts so that equality of interests would remain. The agreement was one of long standing and was first entered into between Hays and Hammond. On October 15, 1930, Hammond and his then wife, Maude T. Hammond, transferred in trust to the Citizens National Trust and Savings Bank of Riverside certain real and personal property, including 642 shares of stock in Press. The trust instrument provided, among other things, that the net income of the trust estate available for distribution should be paid to Hammond during his life; that during the life of Hammond the trustors should have the absolute power of appointment and disposition of the principal and income of the trust estate, after the death of Hammond, such power of appointment to be exercised not by will but only by *316 the last unrevoked written instrument exercising such power and on file with the trustee; that in the exercise of certain powers stated in the trust instrument the trustee should act at all times jointly with the written approval of Hays during his lifetime unless he refused to act in such advisory capacity; that the whole title, legal and equitable, in fee, to the trust estate should be vested in the trustee; that Hammond, until his death, should have, with certain immaterial exceptions, the exclusive possession and use, without rental or other accounting therefor to the trustee, of the real and tangible personal property of the trust estate, and the exclusive management and control of all other property of the trust estate; that Hammond with the written consent of the trustee might add other property; that Hammond during his lifetime might, without the consent of or notice to any beneficiary, by written instruments filed with the trustee and upon payment of sums due the trustee and indemnifying it against any liabilities incurred in administering the trust, revoke the trust in whole or in part and withdraw any or all of the trust estate; that the trustors or Hammond might, with the *317 written consent of the trustee, amend the trust without limitation, amend or cancel any amendments, and limit or divest the rights of any or all beneficiaries. By an amendment accepted by the trustee on November 6, 1933, Hammond amended the trust instrument so as to substitute Myrtle G. Hammond, his then wife, in place of Maude T. Hammond, his former wife, who had died. Arthur A. Culver was born in Kansas in 1906 and grew up there. After finishing high school in 1925 and spending a year on his father's farm, he entered a Kansas college where he spent one semester during which time he took industrial journalism. After leaving college he sold advertising in Kansas on a free lance basis going from one newspaper to another. After having engaged in that work for a time, he became advertising manager and salesman of a semi-weekly newspaper in Kansas. About 1929 he left that employment to enter the securities business in Kansas. In 1930 he went to California and obtained employment with William R. Staats and Company, sometimes hereinafter referred to as Staats Company, which was engaged in the investment banking business with its main office in Los Angeles, California. That company sent *318 him to Riverside, California, as its representative for Riverside and San Bernardino counties, California. In 1935 Culver married Barbara Hammond, daughter of Harry W. Hammond. Thereafter, upon acceptance by the trustee on June 27, 1936, Hammond made a second amendment to the trust instrument of October 15, 1930, whereby Culver was substituted as advisor to the trustee, in place of Hays. During the fall of 1936, Hammond, who was then president of Press, told Culver that he would like to have a member of the family in the employment of Press so as to provide for the continuance of the family's participation in the operation of, and ownership in, Press when he no longer would be able to be its active manager. He asked Culver about terminating his employment with Staats Company and entering the employment of Press at a Salary of $65 per week. Culver declined to do so. Early in 1937 Hammond had a serious heart attack after which he conferred with Hays who was vice-president of Press. They decided that the time had come when Press should employ an energetic, younger man who would gradually take over the management of Press' affairs. They also agreed that such new man should study *319 all phases of Press' operations with the view of making improvements, and that they would not attempt to block any drastic changes of policy advocated by him so long as such changes offered a reasonable basis for expecting increased profits. Accordingly, in April 1937, Culver was employed by Press in the dual capacity of advertising manager and assistant to Hammond. He was employed at a salary of $75 a week which amounted to $3,900 a year. At the time of his employment by Press, Culver had been employed by Staats Company about six years. He was working for that company on a commission basis with a share of the profits derived from the business in the territory in which he worked. His commissions and share of the profits totaled about $4,000 a year. Although Culver considered that the potentialities of the securities business in which he was engaged made his employment in that business more attractive than a minor job with a newspaper, he was of the opinion that his prospects of advancement with Press were comparable to his prospects in the securities business. Culver has continued in the employment of Press. He became a director of Press about 1940 and has continued as such. As planned, *320 Culver gradually took over substantially all of Hammond's duties until he reached the point, by about 1941, where, as business manager, he had supervision of all departments of the organization. However, he continued to consult with Hammond and Hays. Culver also became secretary of Press prior to Hammond's death and following it he became vice-president. At the time Culver was employed by Press, he asked Hammond if he could look forward to owning "some stock" in Press. Hammond replied: "I will sell you some stock at $200 per share. It is a fair price." In 1942 Harry S. Webster, the owner of 44 1/2 shares of stock in Press, notified Hays and Hammond that he desired to sell the stock. They decided that $200 per share was a fair price for the stock and designated Culver to negotiate with Webster for its purchase at that price. The negotiations culminated in the sale on October 6, 1942, of the stock by Webster to Hammond, Hays and Hays' wife for $200 per share. At or around the 1st of June 1943 Hammond told Hays that Culver felt that he would like to purchase some stock in Press. Hays, recognizing that Culver had been in the employment of Press for several years and being of the *321 opinion that he was making good, replied that Culver was able and ambitious and that he (Hays) was agreeable to Culver acquiring some stock in Press, but that he (Hays) "wanted it clearly understood" that such stock "was to be regarded as part of the Hammond stock" and was to be subject to the agreement between Hays and Hammond and their families that they would maintain equal interests in Press. Hammond acquiesced in Hays' reply. Thereafter Hammond agreed to sell Culver 50 shares in Press, and at Culver's suggestion agreed to make some arrangement whereby Culver would have the right to buy the sock from his (Hammond's) estate in event "something happened" to Hammond. On or about June 3, 1943, Hammond wrote in longhand and signed an instrument reading as follows: "Trust Department Citizens National Trust & Savings Bank Riverside Cal.
"Gentlemen: You are hereby authorized to sell to Arthur Culver up to 50 shares of stock of Riverside Daily Press. The price of this stock is to be $200.00 per share. It is to be sold to him in such amounts and at such times as he may desire. "Respectfully "Harry Hammond" Thereafter Hammond executed a typed instrument which on June 3, 1943, was *322 accepted by the trustee as an amendment to the trust instrument of October 15, 1930, and which reads as follows: "AMENDMENT "CITIZENS NATIONAL TRUST AND SAVINGS BANK OF RIVERSIDE, TRUSTEE FOR HARRY W. HAMMOND, Riverside, California
"Gentlemen: "At any time after you assume management of my Trust Estate, and provided you hold therein more than fifty (50) shares of Common Stock of the RIVERSIDE DAILY PRESS, I hereby authorize you to sell to ARTHUR CULVER fifty (50) shares thereof at a price of TWO HUNDRED ($200.00) DOLLARS per share. "Such sale to him shall be in such amounts and at such terms as he may desire. "Dated at Riverside, California, this 3rd day of June 1943. "Respectfully, "/s/ Harry W. Hammond Trustor At or about the time of the execution of the immediately preceding instrument, Hammond, out of shares of Press stock which he then held personally, sold Culver four shares for $800. The four shares were considered by Hammond and Culver to be part of the 50 shares mentioned in the instrument, and on the copy of that instrument which Hammond gave Culver Hammond made the following pen notation: "Sold 4 share 6/3/1943." Later, on or about March 12, 1946, Hammond, *323 out of shares of Press stock which he then held personally, sold Culver an additional seven shares for $1,400. Subsequent to Hammond's death on July 3, 1948, and on November 17, 1948, the trustee transferred 38 shares to Culver and one share to Richard B. Hampson, which thereafter was owned beneficially by Culver. For the 39 shares, Culver paid the trustee $7,800. In the estate tax return filed for the decedent's estate the 662 1/4 shares of stock in Press held in the trust created by decedent were included in the gross estate at a value, $297.96 per share, as of the date of death, July 3, 1948, or at a total value of $197,324.01, and at a value of $236.45 per share on the optional valuation date, July 3, 1949, or at a total value of $156,586.81. In determining the deficiency involved herein the respondent determined that the value of the 662 1/4 shares of stock on July 3, 1949, was $900 per share, or an aggregate value of $596,025. The value of the 662 1/4 shares of stock in Press on the optional valuation date, July 3, 1949, was $550 per share, or a total value of $364,237.50. Opinion Section 811(j) of the Internal Revenue Code of 1939 provides that where an election is so *324 made in the estate tax return of an estate, the gross estate is to be determined by valuing all the property included therein on the date of the decedent's death as of the date one year after the decedent's death, except that property included in the gross estate on the date of death and which, within one year after the decedent's death is sold, shall be included at its value as of the time of such sale, instead of its value as of the date one year after the decedent's death. With respect to the 39 shares of stock in Press which were sold by the trustee to Culver on November 17, 1948, at $200 per share, the petitioner takes the position that under the above mentioned provisions of section 811(j) the applicable valuation date is not July 3, 1949, the date one year after decedent's death, but a date on or about November 17, 1948, and that the only amount of value includible in decedent's gross estate with respect to such shares is $200 a share or $7,800. In support of its position as to the amount of value includible in the gross estate with respect to the 39 shares of stock in Press, the petitioner contends that in 1937 Culver was induced to terminate his employment with Staats *325 Company and enter the employment of Press by reason of Hammond's promise to sell him stock in Press; that upon Culver entering the employment of Press, a contract arose under which Hammond was bound to sell stock in Press to Culver; that the amendment of June 3, 1943, to the trust instrument of October 15, 1930, authorizing the trustee, at any time it held more than 50 shares of Press stock, to sell Culver 50 shares thereof at $200 per share was "given merely to implement the original oral promise" made by Hammond in 1937; and that prior to and at the time of decedent's death the 39 shares of stock in question were subject to an enforceable option held by Culver to buy them at $200 per share. In holding against the petitioner's position as to the value at which the 39 shares of stock in Press were to be included in the gross estate, we concluded in our original report that the trustee never accepted as an amendment to the trust instrument of October 15, 1930, the provisions contained in the instrument executed by the decedent as of June 3, 1943, entitled "Amendment." Upon reconsideration we find that such conclusion was not warranted by the record. Accordingly, we have found as a *326 fact herein that on June 3, 1943, the trustee accepted the aforementioned provisions as an amendment to the trust instrument. Petitioner grounds its aforementioned contentions primarily on the testimony of Culver respecting a conversation he had with Hammond in 1937 at or about the time he agreed to enter the employment of Press. Certain of Culver's testimony is to the effect that he was induced to enter the employment of Press by reason of the salary offered and the opportunity of eventually becoming one of Press' highest executives and of owning a portion of its stock. From a consideration of that testimony along with other testimony of Culver and of other evidence bearing on the matter, we are unable to find that Culver entered the employment of Press under an agreement with Hammond whereby Hammond became obligated to sell Culver stock in Press. While the record shows that before Culver was employed by Press, Hammond and Hays conferred on the matter and agreed upon Culver's employment, including the work he was to perform and the attitude they would take with respect to changes in policy which he might recommend, there is nothing to indicate that the terms of his employment so *327 agreed on by them included the right or option for him to purchase stock in Press from either of them. So far as appears, Hammond's statement in 1937, that he would sell Culver "some stock," at most was intended as an offer to make a present sale and contemplated an immediate acceptance and was not intended as an offer that was to remain open indefinitely. Concededly, in their conversation neither Culver nor Hammond was definite or specific as to any amount, or number, of shares of stock. From the time of the conversation between Culver and Hammond in the early part of 1937 until about June 1943, or for a period of more than six years, nothing further appears to have been said either by Hammond or by Culver about the latter buying any stock in Press. During that period, and about 1940, Culver became a director of Press and thereafter continued as such. By about 1941 he also had become its business manager, having supervision of all of its departments, and subsequently continued as such. In this situation, when Culver in 1943 desired to purchase stock in Press, Hammond did not forthwith sell him stock as would be expected if Hammond had agreed to sell him stock as one of the terms on *328 which he had entered the employment of Press. Instead, before any sale was made, Hammond conferred with Hays to ascertain Hays' views about Culver acquiring stock in Press and the condition upon which Hays would agree to Hammond selling Culver some stock. After obtaining this information, Hammond acquiesced in the condition proposed by Hays. Hammond's action in the foregoing respect is consistent with the long standing agreement between him and Hays that they and their families would maintain equal interests in Press. However, his action is hardly reconciliable with petitioner's position that he was, and for a number of years prior thereto had been, obligated to sell stock to Culver. In view of the foregoing we do not think that in June 1943, or at any time prior thereto, Hammond was under any enforceable obligation to sell Culver any stock in Press. Accordingly, Hammond's agreement in June 1943 to sell Culver 50 shares of stock in Press and his amendment of June 3, 1943, to the trust instrument of October 15, 1930, conditionally authorizing the trustee to sell 50 shares of Culver, were not based on any enforceable agreement growing out of Culver's employment by Press but appear to *329 have been mere voluntary and gratuitous acts on the part of Hammond. Under the trust instrument of October 15, 1930, Hammond, until his death, had the power to revoke the trust in whole or in part, withdraw any or all of the trust estate, amend the trust without limitation, amend or cancel any amendments and limit or divest the rights of any or all beneficiaries. Obviously, with Hammond having the foregoing powers, he was in a position at all times until his death to sell or otherwise dispose of any and all Press stock held in the trust despite the amendment of June 3, 1943. In view of this, and since the amendment of June 3, 1943, was a gratuitous act on Hammond's part, it follows that Culver, prior to Hammond's death, never had any absolute and indefeasible right to purchase stock in Press from the trustee. In this connection it is to be noted that Culver became advisor to the trustee in 1936 and apparently at all times thereafter was familiar with the terms of the trust instrument; and further that such stock in Press as he purchased during the lifetime of Hammond was purchased from Hammond and not from the trustee. Since Hammond had the power of control and disposition of the *330 shares of stock in controversy without liability to Culver with respect thereto, such shares can not be said to have been subject to an enforceable option in Culver prior to Hammond's death. Granting that by Hammond's death Culver acquired an indefeasible right to purchase the stock, his subsequent acquisition of it was under an arrangement which was testamentary in character. Cf. Estate of James H. Matthews, 3 T.C. 525. Therefore, we conclude, as in our original report herein, that the 39 shares of stock in question are to be valued for estate tax purposes at the same amount, namely, $550 per share, as the remaining 623 1/4 shares held in the trust and not sold. To the extent not modified by our findings and holdings herein, the findings and holdings in our original report in all respects are affirmed. Decision will be entered under Rule 50.