ESTATE OF JOSEPH H. LAUDER, DECEASED, LEONARD A. LAUDER AND RONALD S. LAUDER, EXECUTORS, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Lauder v. Commissioner
Docket No. 21525-87
United States Tax Court
T.C. Memo 1992-736; 1992 Tax Ct. Memo LEXIS 784; 64 T.C.M. (CCH) 1643; December 30, 1992, Filed *784 For Petitioner: Albert H. Turkus, Ira T. Wender, Bernard J. Long, Jr., Corinne M. Antley, and Maria L. Olsen. For Respondent: John A. Guarnieri and Clement Shugerman. HAMBLEN
HAMBLEN
MEMORANDUM FINDINGS OF FACT AND OPINION HAMBLEN, Chief Judge: Respondent determined a deficiency of $ 42,702,597.67 in the Federal estate tax due from the Estate of Joseph H. Lauder (petitioner). In Estate of Lauder v. Commissioner, T.C. Memo. 1990-530, we denied petitioner's motion for partial summary judgment that restrictive shareholder agreements, to which Joseph H. Lauder (Joseph or decedent) was a party, control the question of the value of stock in a closely held corporation for purposes of the Federal estate tax. We found that Joseph's health was satisfactory and normal for a man of his age on the dates that the shareholder agreements were executed. Nonetheless, we concluded that further factual development would be necessary to aid the Court in determining whether the shareholder agreements were intended to serve as a device to pass Joseph's stock to the natural objects of his bounty for less than an adequate and full consideration in money or money's worth. *785 Sec. 20.2031-2(h), Estate Tax Regs. [1]
FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulations of facts and attached exhibits are incorporated herein by this reference. Joseph H. Lauder died testate at age 81 in the State of New York on January 16, 1983, survived by his wife, Estee Lauder (Estee), and his two sons, Leonard A. Lauder (Leonard) and Ronald S. Lauder (Ronald). (References to the Lauders are to Estee, Joseph, Leonard, and Ronald collectively.) I. Background
A. Estee Lauder, Inc.
Estee Lauder became interested in skin care and cosmetics as a young girl while assisting her uncle, a chemist, with the preparation of skin creams in a laboratory behind her family's house. Estee and Joseph entered the cosmetics business just after World War II. On May 20, *786 1958, Fragrance Products Corp. was incorporated under the laws of the State of New York. In 1963, the name of the company was changed to Estee Lauder, Inc. (ELI). At all times pertinent hereto, ELI and its subsidiaries and affiliates were engaged in the manufacture and distribution of cosmetics, fragrances, and related products. In the beginning, ELI sold four basic skin care products through a few beauty salons in New York City. Estee and Joseph were ELI's sole employees and business was conducted in the rented basement of a building in New York City. Saks Fifth Avenue was the first specialty store to carry ELI's products. Through the mid-seventies, the Lauders maintained a policy of distributing ELI's products exclusively through high-end specialty and department stores. Leonard and Ronald began working part-time for the business during their early teenage years, delivering orders and doing odd jobs. Leonard, who is 11 years older than Ronald, joined the business on a full-time basis in 1958 after graduating from the University of Pennsylvania and serving in the United States Navy. At that time, ELI generated annual sales of $ 800,000 and its facilities were so small that *787 Leonard shared an office with Estee, served as the only salesman, and was also responsible for public relations, product advertising, marketing, and package delivery. Leonard became president of ELI in 1973. Ronald joined the business on a full-time basis in 1967. Prior to that time, Ronald attended the University of Pennsylvania, studied international business at the University of Brussels (while working in ELI's factory in Belgium), and served in the United States Coast Guard. Initially, Ronald serviced two major accounts and was coordinator of marketing groups. Ronald became ELI's vice president for marketing and sales in 1973. Estee attributed the success of the business to the family's hard work. The Lauders shared the view that it was of utmost importance to keep the business in the family. As one of the few privately held cosmetics companies, the Lauders believed that ELI operated at a substantial advantage over its competitors. In their view, ELI was in a position to take more risks and move more aggressively than publicly held companies. Further, market share and sales could be built without concerns of showing an immediate profit. At various times, the Lauders *788 have been urged to make a public stock offering. The Lauders have remained opposed to such suggestions. Prior to 1975, the Lauders never engaged an investment banker or other outside consultant for this purpose nor did they solicit or receive any information regarding the price that their shares would bring in a public offering. ELI common stock has never been publicly traded. From March 31, 1967, through December 14, 1976, the Lauders owned all of ELI's outstanding common stock. Although persons and organizations other than the Lauders and their immediate family have owned stock in ELI and its affiliates, the Lauders have always maintained control over ELI. ELI preferred stock has been owned by the Lauders and various organizations, including schools, museums, a hospital, and the Lauder Foundation. The Lauders intend that a third generation of their family eventually will manage and control the family business. To this end, Estee and Joseph's grandchildren have joined the business in entry level positions commensurate with their respective ages and experience. B. Operating Divisions and Related Corporations
As of 1974, ELI had three major operating divisions: Estee *789 Lauder U.S.A., Clinique, and Estee Lauder, International. 1. Estee Lauder, U.S.A.
During the period in question, Estee Lauder U.S.A. maintained three separate product lines: Fragrances, makeup, and skin care treatment. Estee Lauder U.S.A. relied heavily on sales of a fragrance, Youth Dew, first introduced to the market in 1953. In 1974, 1975, and 1976, Youth Dew sales were approximately $ 35.8 million, $ 35.7 million, and $ 37.5 million, respectively. To reduce its reliance upon Youth Dew, Estee Lauder U.S.A. introduced several new products during the late sixties and early seventies, including the fragrances "Estee", "Azuree", "Aliage", and "Private Collection". 2. Clinique and The Hypo-allergenic Rule
The Clinique division appears to have originated in 1968. C.L. Allergenics, Inc., was organized as a New York corporation on December 13, 1973. Its name was subsequently changed to Clinique Laboratories, Inc. (Clinique) on December 28, 1973. Clinique products are marketed as fragrance-free and allergy-tested to attract women with sensitive skin and younger women who want a more natural look from their cosmetics. From 1973 through 1976, ELI owned all of Clinique's *790 class A common stock which represented 80 percent of Clinique's voting stock. During this same period, Leonard and Ronald owned all of Clinique's class B common stock which represented 20 percent of Clinique's voting stock. ELI was entitled to a preference as to Clinique's first $ 750,000 in earnings available for dividends as well as 50 percent of any earnings in excess of that amount. Leonard and Ronald were entitled to 50 percent of Clinique's earnings available for dividends in excess of $ 750,000. Clinique initially acted as a cash drain on ELI causing overall losses through 1970. However, Clinique experienced extraordinary success and rapid growth during the years 1972 through 1976, with gross profits from domestic sales increasing from $ 5.1 million in 1972 to $ 26.6 million in 1976. During 1976, Clinique accounted for approximately 15 percent of ELI's total sales. Its fast growth was in part related to the small base from which it started. The executive head of the Clinique division had the impression that some others in ELI and the industry considered Clinique to be a fad. In February 1974, the Food and Drug Administration (FDA) issued a proposed rule to require *791 extensive testing and proof to support the use of the terms "hypo-allergenic" or "allergy tested" in describing a cosmetics product (the hypo-allergenic rule). Although the hypo-allergenic rule was eventually issued in final form, its effective date was stayed on July 23, 1975, pending the outcome of a lawsuit brought by Clinique and Almay, Inc., challenging its validity. On June 30, 1976, the hypo-allergenic rule was upheld in Almay, Inc. v. Weinberger, 417 F.Supp. 758 (D.D.C. 1976). However, the District Court's decision was subsequently vacated and remanded in Almay, Inc. v. Califano, 569 F.2d 674 (D.C. Cir. 1977), on the ground that the hypo-allergenic rule was arbitrary and capricious. The rule was revoked effective March 14, 1978. While the hypo-allergenic rule was pending and in effect, Almay, Inc., removed hypo-allergenic labeling from its packaging. Thereafter, its sales growth stagnated and a newly introduced product failed to gain market share. Following the Court of Appeals decision, Almay, Inc., resumed using the hypo-allergenic labeling, and its sales increased soon thereafter. Although the Clinique *792 division was affected by the rule, ELI's audited financial statements for the years 1972 through 1976 do not mention the hypo-allergenic rule. 3. International
The International division markets all of ELI's principal products overseas. From its origination in 1961 until 1974, International remained in a "startup" phase, requiring large outlays of capital and producing few returns. During this period, cosmetics markets in many foreign countries were difficult to penetrate by virtue of trade barriers ranging from secret lists of prohibited ingredients to specialty store boycotts. During the years 1974, 1975, and 1976, International's gross profits were $ 29.7 million, $ 41.5 million, and $ 51.5 million, respectively. 4. Mentzer Holdings, Inc.
Mentzer Holdings, Inc. (Mentzer), was organized as a Delaware corporation on March 18, 1975, to serve as a holding company for the shares of Estee Lauder Cosmetics, Ltd. (U.K.). Estee Lauder Cosmetics, Ltd. (U.K.), markets cosmetics and fragrances in the United Kingdom. Prior to March 1975, the stock of Estee Lauder Cosmetics, Ltd. (U.K.), was owned by the Lauders and ELI. Mentzer was organized in part to enable the Lauders *793 to avoid potential estate tax liability in the United Kingdom. 5. EJL Corporation
EJL Corporation (EJL) was organized as a Delaware corporation on December 14, 1976, to serve as a holding company for ELI (and its subsidiaries) and Mentzer. From 1976 through February 1991, EJL's voting common stock was owned by the Lauders directly. Other than 2,100 shares of nonvoting common stock that were contributed to the University of Pennsylvania in 1976 (and later redeemed by EJL in 1981), EJL's nonvoting common stock was at all times owned by the Lauders, either directly or as trustees for certain trusts established for the children of Leonard and Ronald. EJL preferred stock has been owned by the Lauders and various organizations, including schools, museums, a hospital, and the Lauder Foundation. 6. Aramis, Inc.
Aramis, Inc., was founded by the Lauders as a separate corporation in 1965 to manufacture and market a complete line of fragrances and related products for men. Aramis products were marketed and distributed jointly with ELI products. II. The Industry
The third quarter of 1973 marked the beginning of a serious recession in the United States. The recessionary *794 cycle reached its lowest point during the second quarter of 1975. The recession was exacerbated by many factors, including the effects of rising oil prices and the tightening of the money supply by the Federal Reserve. The economy appeared to be recovering by the latter part of 1975 and the early part of 1976. During the period in question, the potential for profitability in the cosmetics and toiletries industry was above average as compared to other manufacturing industries. Industry sales were made through a variety of retail outlets and door-to-door. The products sold through retail outlets included both mass market items sold in supermarkets and drug stores and prestige cosmetics lines sold in high-end specialty and department stores. Retail competition was strong, and advertising outlays, such as gift-with-purchase advertising, reduced profits. A relatively small group of companies generated a substantial portion of retail sales with six companies accounting for 40 percent of total retail sales in 1975. During the early seventies, several pharmaceutical companies entered the cosmetics industry through the acquisition of established companies. For example, Squibb acquired *795 Lanvin-Charles of the Ritz, Eli Lilly acquired Elizabeth Arden, and Colgate-Palmolive acquired Helena Rubenstein. Designer fragrances were first introduced to the market during the seventies. In addition, mass market sales grew during this period reflecting a trend toward one-stop shopping. During the early seventies, the number of "doors", the industry term for retailing locations, increased. Between 1971 and 1975, sales of cosmetics, toiletries, and women's fragrances increased on an industry-wide basis by 31.7 percent, reflecting average annual growth in excess of 7 percent. Fragrance sales are very seasonal with the high point of sales occurring during the Christmas holidays. III. Marketing and Financial Performance
A. Marketing
ELI promoted its products as high quality lines and priced them at prestige levels. During the period 1974 though 1976, ELI's revenues were derived primarily from sales of fragrances for women. The Lauders have always considered their reliance on high-end specialty and department stores as the exclusive means for distributing ELI products to be a key element of their success. During the period in question, the Lauders were the industry *796 leaders in marketing to high-end specialty and department store chains, with Revlon, Inc. (Revlon), providing substantial competition. During this period, Revlon introduced higher-priced luxury products often designed to challenge ELI products. The Lauders' unique marketing plan provided ELI with many advantages over its competitors. In particular, the Lauders were very selective in choosing specific retailers, individual stores within a particular retail chain, and the specific geographic areas where ELI products would be sold. Through this program, the Lauders were able to ensure that ELI products would be distributed to those individual stores with strong cosmetics departments. The Lauders aggressively promoted ELI products. Prior to opening a new account, a senior sales representative would work with the store's management to develop an 18-month "action plan". Due to their marketing and promotional skills, the Lauders often would find themselves managing a major portion of a store's total cosmetics promotion budget. In return, these stores would pay a large percentage of ELI's in-store personnel and promotional costs, whereas most of ELI's competitors were required to *797 absorb all of these expenses. As a consequence of their in-store managerial role, the Lauders were able to access a department store's 5-year plan for new store openings, allowing the Lauders to target new opportunities at an earlier stage than their competitors. Finally, the Lauders would demand, and almost always receive, the best counter location for displaying ELI products within each store. Once a retail location was established, the Lauders would use the store's customer lists to send mailers or billing inserts advertising gift-with-purchase sale promotions. These promotions, although expensive, were very successful. Sales representatives would also organize bridal shows and free demonstrations. ELI's competitors in the cosmetics industry generally remained committed to costly mass market media advertising campaigns. B. Financial Performance
During 1974, the cosmetics and toiletries industry experienced an average return on equity of 16.6 percent. During 1974, ELI experienced a return on equity of 29.9 percent. During the years 1972 through 1976, ELI's net sales grew at a compound annual rate of 24.1 percent. In absolute terms, its net sales grew from $ 95.4 million *798 for 1972 to $ 226.4 for 1976. Some of ELI's sales growth was attributable to "pipelining" products in international markets. [2]
For the years 1972 through 1976, ELI's net income grew at an annual compound rate of 18.8 percent. ELI experienced a decline in net income in 1975 from the prior year. Between 1974 and 1976, ELI's net income (before extraordinary credits) increased from $ 8 million to $ 10.3 million. During this same period, the total value of ELI's assets (book value) increased from $ 76.6 million to $ 123.5 million. In a July 15, 1975, article appearing in Forbes magazine, Leonard was quoted as predicting that ELI's sales and profits would "at least double in the next three to five years." ELI did not pay substantial dividends during the years 1974 *799 through 1976. Earnings generally were reinvested in the business during this period. In 1975, ELI engaged an investment banking firm, Warburg Paribas Becker, Inc. (Warburg), to assist in raising capital. At the time, ELI was considering a private placement of $ 15 million of debt securities. In conjunction with the proposed private placement, Warburg was supplied with ELI's financial statements. In November 1975, Warburg released a detailed private placement memorandum to at least one insurance company considered to be a potential investor for the proposed offering. In 1976, the Lauders decided to withdraw from the transaction. C. Financial and Tax Accounting Records
From 1972 through 1977, ELI and EJL operated on a fiscal year ending June 30 for financial statement and tax accounting purposes. ELI's audited financial statements were prepared by Arthur Anderson & Co. during the period in question. Prior to the fiscal year ending June 30, 1974, financial statements were prepared on a combined basis for ELI, its subsidiaries, and affiliated companies, including Aramis, Inc. Thereafter, ELI's financial statements were prepared on a consolidated basis with its subsidiaries *800 only. During the period 1970 through 1977, ELI maintained unaudited financial statements for internal purposes with respect to some of its divisions. These statements did not fully eliminate the effect of intercompany transactions on the financial results. During this period, ELI had no overall interdepartmental budgeting plan or costing system. As a consequence, inventory did not always correspond with sales forecasts. D. Management
ELI relied on Leonard, and to a lesser extent Estee, for managerial decisions. From 1974 through 1976, and thereafter, Joseph was executive chairman of the board of directors and treasurer, Estee was chairman of the board, Leonard was president and a director, and Ronald was vice president and a director. On January 16, 1983, the date of decedent's death, decedent, Estee, and Leonard continued to hold the same positions. At that time, Ronald was executive vice president and a director. IV. Shareholder Agreements and Related Transactions
A. The Trademark Agreement
In the late sixties, ELI began to explore the possibility of raising funds through various outside sources, including loans from commercial banks and the private *801 placement of securities with insurance companies and other institutional investors. ELI was unsuccessful in raising such funds due in large part to the fact that ELI did not possess outright ownership of many of the trademarks and other assets conducive to its continued growth and profitability. Recognizing that "the goodwill of [ELI] is symbolized by the name Estee Lauder and the Estee Lauder Trademark and Dependent Trademarks," Estee and ELI entered into an agreement, dated December 19, 1969, whereby Estee agreed to sell to ELI all of her right, title, and interest in the trademark for the name and style "Estee Lauder" as well as all dependent trademarks. In consideration for the trademarks, ELI promised to pay Estee an annual royalty of 3 percent of its net sales or a minimum of $ 1.2 million annually for her life. While ELI was authorized to terminate the agreement after 15 years, Estee could only terminate the agreement upon the default of ELI. B. The Worsfold Agreement
In January 1960, Robert Worsfold (Worsfold) [3] joined the International division in an executive capacity. By 1975, Worsfold was president of International and an executive vice president of ELI. *802 Sometime in late 1970 or early 1971, Worsfold was offered a position with Lanvin, Charles of the Ritz. As an inducement to retain Worsfold as an employee, Leonard arranged for ELI to transfer 297 shares of Estee Lauder Hemisphere Corp. (Hemisphere), an ELI subsidiary operating in the Caribbean, into trust for Worsfold's benefit with Leonard acting as trustee. Pursuant to an agreement (the Worsfold agreement) dated September 3, 1971, ELI agreed to purchase the shares from the trust at a specified formula price if the trustee desired to sell. The formula price was based on 10 times Hemisphere's average earnings for the 3 fiscal years preceding the sale, reduced by the par value of any outstanding preferred stock and any accrued dividends. In no event was the formula price to be less than book value. Worsfold did not negotiate the formula price because it was his understanding that he would earn a $ 1 million bonus pursuant to the agreement if he enhanced Hemisphere's operations. On January 11, 1974, the Worsfold agreement was amended to permit ELI to purchase the shares from the trust under an installment plan. On the same day, ELI purchased the shares for $ 1 million to be *803 paid in installments. C. The Clinique Agreement
On December 1, 1973, ELI, Clinique, Leonard, and Ronald executed a shareholder agreement (the Clinique agreement) restricting the transfer of Clinique stock. The price at which shares could be offered for sale under the Clinique agreement was limited by a formula based on book value. D. The ELI Agreement
On May 28, 1974, ELI common stock (voting and nonvoting) was owned as follows: Shareholder
Voting (%)
Nonvoting (%)
Total
Estee
2,546 (67)
9,754 (32)
12,300
Joseph
684 (18)
7,452 (24)
8,136
Leonard
285 (7.5)
6,951 (22)
7,236
Ronald
285 (7.5)
6,951 (22)
7,236
Totals
3,800
31,108
34,908
On this date, the Lauders and ELI executed a document entitled "Shareholder Agreement" (the 1974 agreement). [4] The 1974 agreement states in pertinent part: Article 2. Voluntary Transfer. 2.1 Notice. If any Shareholder during his lifetime (the "Offeror") intends to transfer any Shares which he owns, he shall give written notice to the Corporation and the other Shareholders of his intention to do so. The notice shall state the number of Voting Shares and the number of Nonvoting Shares to be *804 transferred. 2.2 First Offer. Within 60 days after the receipt by the Corporation of the foregoing notice, each of the other Shareholders shall have the option to purchase for a purchase price determined in accordance with Article 6 hereof, such portion of the Voting Shares and such portion of the Nonvoting Shares set forth in such notice (the "Offered Shares") as the number of Voting Shares and the number of Nonvoting Shares owned by him on the date of receipt of such notice shall bear to the total number of Voting Shares and the total number of Nonvoting Shares owned by the Shareholders, provided, however, that if any Shareholder does not purchase his full proportionate share of the Offered Shares, the unaccepted Shares may be purchased by the other Shareholders proportionately. 2.3 Second Offer. If for any reason all the Offered Shares are not purchased by the Shareholders within 60 days after the Corporation's receipt of such notice, the Corporation shall have the option to purchase all of the Offered Shares not purchased by the Shareholders for a purchase price determined pursuant to Article 5 [6] hereof on a date to be mutually determined by the Shareholders, but *805 not later than 90 days after the Corporation's receipt of such notice. Notwithstanding anything herein contained to the contrary, if the Offeror at the time of giving notice owns more than fifty percent (50%) of the Voting Shares, the Corporation shall be required to purchase all of the Offered Shares which are Voting Shares and which are not purchased by the Shareholders for a purchase price determined pursuant to Article 6 hereof on a date to be mutually determined by the Shareholders but not later than 90 days after the Corporation's receipt of such notice. * * * * * * Article 3. Transfer Upon Death. Upon the death of any Shareholder, all of the Shares then held in the estate of the deceased Shareholder shall be offered for purchase according to the terms of Paragraphs 2.2 and 2.3 of Article 2 hereof * * *. * * * Article 6. Purchase Price. 6.1 Determination of Value. The purchase price of Shares to be purchased hereunder shall be the net per share book value of such shares (excluding any value for all intangible assets, such as goodwill * * *, etc.) as determined in the last audited annual statement of the Corporation preceding (a) the date the notice with *806 respect to such shares is received by the Corporation; (b) in the event of a transfer pursuant to Article 3 hereof, the date of death of the deceased Shareholder; or (c) in the event of a transfer pursuant to Article 4 hereof, the date of termination of employment (the "last Audited Statement Date"). The determination in such last audited annual statement shall be final and binding upon all parties.
While the 1974 agreement generally applies to voluntary transfers and transfers after the death of a shareholder, the agreement also mandates that a shareholder's stock be offered for sale to the remaining shareholders upon: The shareholder's termination of employment with ELI, [5] or an involuntary transfer by operation of law (e.g., bankruptcy). *807 Article 6.2 of the agreement states that in computing the purchase price for the shares, book value is to be reduced by the amount of any dividends paid subsequent to the date of the last financial statement and before the closing date of the stock sale and adjusted by the receipt of any unrecorded tax refund or prepayment of any tax deficiency. Article 6.3 states that the purchase price for the shares may be paid either in cash or by delivery of a 10-year debenture bearing interest at 4 percent. The 1974 agreement was Leonard's idea. Leonard arrived at the book value formula after consulting with Arnold M. Ganz, a close family financial adviser now deceased. [6]Leonard did not compare the stock prices of publicly traded cosmetics companies with their respective book values. No appraisal of ELI or its stock was obtained in connection with the 1974 agreement. In arriving at the formula price, Leonard considered that companies listed in the Standard & Poor's 400 Index were selling at approximately book value. An index within the Standard & Poor's 400 reflects an average price-to-book-value ratio of approximately 2 to 1 for cosmetics companies during 1974. *808 Estee had no specific recollection of the 1974 agreement. Ronald did not know who decided that the price per share under the 1974 agreement would be based on book value. Ronald recalled that Leonard explained the book value pricing formula to him. Ronald did not give much thought to the pricing formula before agreeing to join in the 1974 agreement. The purchase price per share of ELI common stock on May 28, 1974, as determined in accordance with Article 6 of the 1974 agreement, was $ 614.70. E. The Mentzer Agreement
On April 30, 1975, the Lauders, ELI, and Mentzer executed a shareholder agreement similar to the 1974 agreement. F. The 1976 Stock Swap
On June 4, 1976, Leonard and Ronald each transferred 38 shares of ELI voting common stock to Joseph in exchange for 38 shares of ELI nonvoting common stock (the 1976 stock swap). As a result, Joseph's holdings of voting common stock were increased from 18 to 20 percent. One purpose of the 1976 stock swap was to ensure that Joseph's estate would be eligible to elect to pay its Federal estate tax in installments under section 6166. The Lauders and ELI waived their rights to purchase the shares transferred in the 1976 *809 stock swap. [7]
G. The EJL Agreement
As previously mentioned, EJL was formed as a holding company for ELI and Mentzer on December 14, 1976. On the same day, the Lauders and EJL executed a document entitled "EJL Shareholder Agreement" (the 1976 agreement). On that date, the common stock of EJL was owned as follows: Shareholder
Voting (%)
Nonvoting (%)
Total
Estee
2,546 (67)
9,754 (32)
12,300
Joseph
760 (20)
7,376 (24)
8,136
Leonard
247 (6.5)
6,989 (22)
7,236
Ronald
247 (6.5)
6,989 (22)
7,236
Totals
3,800
31,108
34,908
The terms of the 1976 agreement are essentially identical to those of the 1974 agreement, except that: (1) The first option to purchase rests with EJL; (2) payment may be made in cash or in 20-year debentures bearing interest equal to the average industrial bond yield for "Aa" rated bonds for the 3 months preceding their issuance; (3) EJL's consent is required for any transfer *810 of common stock to a nonshareholder and the prospective shareholder must agree to be bound by the terms of the 1976 agreement; [8] and (4) the formula for determining the purchase price of the shares is based on book value reduced by the amount of dividends payable, as well as dividends paid, during the period between the valuation date and the close of the stock sale. Prior to executing the 1976 agreement, neither the Lauders nor EJL obtained an appraisal of EJL or its stock, nor did they compare the stock prices of publicly traded cosmetics companies with their respective book values. Leonard did not examine the Standard and Poor's 400 Index in determining the pricing formula used in the 1976 agreement. An index within the Standard & Poor's 400 reflects an average price to book value ratio *811 of approximately 3 to 1 for cosmetics companies during 1976. Estee had no specific recollection of the 1976 agreement. The purchase price per share of EJL common stock on December 14, 1976, as determined in accordance with Article 6 of the 1976 agreement, was $ 1,212.07. H. Transfers to Trusts for the Benefit of the Children of Leonard and Ronald
On December 15, 1976, the Lauders transferred a total of 4,100 shares of EJL nonvoting common stock to four separate trusts established for the benefit of the four children of Leonard and Ronald. In connection with these transfers, the Lauders and EJL waived their rights to purchase the stock under the 1976 agreement, while the trustees (Leonard and Ronald) agreed to be bound by the terms of the 1976 agreement. Each of the Lauders filed Federal gift tax returns reporting the stock transfers described above. The stock was valued pursuant to the terms of the 1976 agreement at $ 1,212.07 per share. Upon examination of decedent's Federal gift tax return, the Internal Revenue Service issued a "no change" letter. I. Transfers to University of Pennsylvania
On December 15, 1976, Joseph, Estee, Leonard, and Ronald transferred 540, *812 810, 375, and 375 shares of EJL nonvoting common stock, respectively, to the University of Pennsylvania. In connection with these transfers, the Lauders and EJL waived their rights to purchase the stock under the 1976 agreement and the University agreed to be bound by the terms of the 1976 agreement. Following the transfer, neither EJL nor any of its shareholders had any right to call these shares. Joseph claimed a charitable contribution deduction on his Federal income tax return for the taxable year 1976 with respect to the stock he transferred to the University of Pennsylvania. The stock was valued pursuant to the terms of the 1976 agreement at $ 1,212.07 per share. The Internal Revenue Service, upon examination of Joseph's return, did not propose any adjustment with respect to this item. On June 26, 1981, the shares held by the University of Pennsylvania were redeemed at $ 2,947.01 per share, the price per share being determined pursuant to the terms of the 1976 agreement. J. Amendment of the EJL Agreement
In February 1983, Ronald began serving as Deputy Assistant Secretary of Defense for European and NATO policy. At that time, Ronald resigned his position as an *813 officer of EJL and its related companies. Ronald nonetheless continued to serve as an EJL director. From April 1986 to November 1987, Ronald served as U.S. Ambassador to Austria. Pursuant to Federal law, Ronald was required to resign his positions with EJL, including his position as a director. On April 18, 1986, the Lauders agreed to amend the 1976 agreement to provide that the resignation of an employee, officer, or director of EJL required in connection with the acceptance of an elected Government office or appointment to a position in public service would not be deemed to be a termination of employment under the agreement. Consistent with this amendment to the 1976 agreement, Ronald was not obligated to offer his shares for sale to EJL or the remaining shareholders while serving as Ambassador to Austria. Ronald eventually returned to EJL in November 1987. From June 1981 (when the shares held by the University of Pennsylvania were redeemed) through the time of trial, EJL common stock has been held solely by the Lauders or by trusts for the benefit of the children of Leonard and Ronald. V. Wills and Codicils
Joseph and Estee executed original wills in 1963. [9] Shortly *814 after entering into the 1974 agreement, Joseph and Estee executed codicils to their wills eliminating bequests originally intended to ensure that Leonard and Ronald would own an equal number of shares in ELI. These equalization provisions were no longer necessary to the extent Leonard and Ronald had held an equal number of shares in ELI since 1971. Leonard had a will in effect in 1974 naming his spouse and children as his principal beneficiaries. Ronald believed he had a will in effect in 1974 and that his wife and children were the primary beneficiaries. Ronald was unable to locate a copy of the will. VI. Federal Estate Tax Return, Deficiency Notice, and Petition
On the date of Joseph's death, EJL common stock was owned as follows: Owner
Voting
Nonvoting
Total
Estee
2,546
7,684
10,230
Joseph
760
5,996
6,756
Leonard
247
5,614
5,861
Ronald
247
5,614
5,861
Trusts for the
0
4,100
4,100
children of Leonard
and Ronald
Totals
3,800
29,008
32,808
*815 On April 30, 1983, petitioner sold decedent's 6,756 shares of EJL common stock to EJL at $ 4,111 per share, the price per share being determined pursuant to the terms of the 1976 agreement. Petitioner reported decedent's shares of EJL common stock as having a date of death value of $ 29,050,800 (or $ 4,300 per share) on its Federal estate tax return. In the statutory notice of deficiency, respondent determined the date of death value of decedent's stock to be $ 89,517,000 (or $ 13,250 per share). In its petition, petitioner alleges that the correct date of death value of the stock is $ 27,773,916 (or $ 4,111 per share). [10]
VII. Expert Evidence
The parties filed expert reports and presented expert testimony intended to assist the Court in determining the value of decedent's *816 stock at the time the 1974 and 1976 agreements were executed. (For convenience, ELI and EJL are hereinafter referred to solely as EJL.) A. Petitioner's Experts
1. Shutzer
Petitioner retained Shearson Lehman Brothers, Inc. (Shearson Lehman), an investment banking firm, to value the EJL stock held by decedent as of the dates that the two shareholder agreements were executed. William A. Shutzer (Shutzer), a managing director with Shearson Lehman, participated in the evaluation of the EJL stock and testified on petitioner's behalf at trial. Shearson Lehman relied on the comparative market valuation method to value the EJL common stock. Under this method, the market value of EJL stock is derived from a comparison of EJL'S financial and operating performance with that of similar companies whose shares are publicly traded. Shearson Lehman views the comparative market valuation method as the most reliable and accurate method available to value both private and public companies because it directly incorporates actual market data as of specific dates. Further, Shearson Lehman views the price/earnings ratio (the current market price per share divided by earnings per share) *817 as the most reliable ratio to apply in carrying out a comparative analysis. [11] According to Shearson Lehman, the price/earnings ratio is the primary method used by leading investment banking firms and other investors to price securities and value companies. *818 Using the market valuation ratios of comparable companies as a reference point, Shutzer estimated market ratios for EJL taking into account the state of the economy, the nature of the cosmetics industry, EJL's earnings, the prospects for future competition, and EJL's growth potential. Shutzer selected the following publicly traded companies for comparison to EJL: Avon Products (Avon); Chesebrough-Ponds (Ponds); Del Laboratories, Inc. (Del); Faberge Inc. (Faberge); Helene-Curtis Industries, Inc. (Helene Curtis); La Maur, Inc. (La Maur); Mary Kay Cosmetics, Inc. (Mary Kay); MEM Company, Inc. (MEM); Noxell Corporation (Noxell); and Revlon. Shutzer calculated price/earnings multiples and certain performance ratios for each of the 10 companies. In comparing the financial performance of these companies with EJL, Shutzer weighed certain negative factors which he perceived in EJL. Specifically, Shutzer was concerned with: (1) The effect of the hypo-allergenic rule on Clinique; (2) whether Youth Dew could sustain its rate of growth; (3) whether EJL's exclusive distribution methods were prudent in view of the trend towards one-stop shopping in drug stores and grocery chains; (4) whether *819 EJL had sufficient levels of middle management and financial controls to keep pace with its growth; and, (5) whether EJL's manufacturing operation made it too dependent on outside manufacturers. Shutzer evaluated Avon as a much larger, more secure company than EJL, with revenues, net income, and profit margins all in excess of those of EJL. From this, he concluded that EJL would have "substantially lower" price/earnings multiples than Avon's multiples of 20.7 and 17.7 as of May 1974 and December 1976, respectively. Ponds was considered a broader based company in light of its high-end and mass market products and diversification into other industries. Its revenues were more than three times those of EJL, its net worth was almost eight times that of EJL, its operating profit margins were consistently 2 to 3 percentage points higher than those of EJL, and its net income margin in 1975 was more than double that of EJL. Ponds' superior performance in these areas led Shutzer to conclude that EJL's price/earnings multiples would be "substantially lower" than Ponds' multiples of 23.4 and 14.1 as of May 1974 and December 1976, respectively. The majority of Del's products, such as "Sally *820 Hansen" and "Hard as Nails", were sold through drug stores and grocery chains. According to Shutzer, Del was viewed by the market as "somewhat risky" as of May 1974, and therefore EJL would have had a price/earnings multiple in excess of Del's multiple of 5.1 for that period. As of December 1976, Del's sales and net income had steadily increased, and its net income margin, which remained steady between 1972 through 1976, was 6.6 percent of sales. Nonetheless, Shutzer concluded that EJL's price/earnings multiple as of December 1976 would have been at a premium to Del's multiple of 8.4 in light of EJL's stronger than expected sales and earnings growth for that period. Faberge was another of the many companies in the lower margin mass market. EJL's revenues were growing at a much faster rate than those of Faberge (24 percent as compared to 8.8 percent) and EJL's operating profit margins were almost double those of Faberge. Shutzer concluded that EJL's price/earnings multiple would have been at a premium to Faberge's multiple of 4.6 as of May 1974. However, Shutzer opined that Faberge's multiple of 12.4 for December 1976 related to an anticipated rebound in Faberge's future earnings *821 and would not be instructive in valuing EJL which would have a lower multiple on that date. According to Shutzer, Helene Curtis' products had "little prestige appeal and competed on an almost commodity-like basis with those of other major hair-care manufacturers". During the period 1972 to 1976, Helene Curtis' compound annual growth rate in sales was 13 percent contrasted with EJL's 24.1 percent rate. Helene Curtis lost money in 1973 and was only "marginally profitable" during 1974 to 1976. From this, Shutzer concluded that EJL's price/earnings multiples would have been at a premium to Helene Curtis' multiples of 6.1 and 7.2 as of May 1974 and December 1976, respectively. La Maur's consumer products were sold through mass market outlets such as discount stores and grocery chains. Its professional products, the sales of which accounted for 36 percent of revenues, were sold through beauty salons and barber shops. La Maur's products were targeted to medium-to-low income consumers. In 1974, La Maur barely broke even. Shutzer concluded that EJL's price/earnings multiples would be significantly higher than La Maur's multiples of 6.6 and 6.4 as of May 1974 and December 1976, respectively. *822 Shutzer characterized Mary Kay's financial record as "extremely impressive" with 10 years of uninterrupted growth in net income from $ 0.1 million in 1966 to $ 6.1 million in 1976. For the period 1972 through 1976, Mary Kay's sales and net income grew at an average annual compound rate of 26.3 and 22.8 percent, respectively, while EJL's growth in these areas was limited to 24.1 and 18.8 percent, respectively. Mary Kay's net income margin during the period in question was almost three times that of EJL. Mary Kay's earnings growth was uninterrupted during the 1974-75 recession whereas EJL's earnings declined by 20.2 percent in 1975. Shutzer believed that Mary Kay's price/earnings multiples of 28.6 and 17.2 percent as of May 1974 and December 1976, respectively, would be much higher than those of EJL. MEM's products, such as "English Leather", were sold in drugstores and lower-end department stores, and were used predominantly by men, which restricted its market compared to EJL's. Although MEM's operating income margins were slightly better than those of EJL, MEM was a much smaller company and was growing at a slower pace than EJL. From 1972 through 1976, MEM's sales and net *823 income grew at average annual compound rates of 11 and 9.6 percent, respectively, as contrasted with EJL's higher rates of growth in these areas. From this, Shutzer concluded that EJL's price/earnings multiples would be significantly higher than MEM's multiples of 4.0 and 5.8 for May 1974 and December 1976, respectively. Noxell's major products, "Noxzema" and "Cover Girl", were distributed through mass market outlets and aimed at middle income and younger consumers. Noxell's sales and earnings increased at compound annual growth rates of 13.9 percent and 18.5 percent, respectively, for the 10-year period ending in 1973. Shutzer viewed its record as outstanding from its founding in 1917 through 1973, and concluded that EJL's price/earnings multiple for May 1974 would have been at a substantial discount to Noxell's multiple of 20.4 for the same period. However, Noxell's performance was somewhat mixed thereafter. Although sales increased in 1974, net income declined from 1973. In addition, sales were flat and net income again declined in 1975. Sales and earnings bounced back in 1976 with increases of 20.8 and 42.9 percent, respectively. Shutzer viewed Noxell's major products *824 as stable, in comparison to EJL's dependence on Youth Dew and the risk from the hypo-allergenic rule to the Clinique products. Balancing Noxell's mixed performance against the stability of its products, Shutzer concluded that EJL's price/earnings multiple for December 1976 would be at a slight discount to Noxell's multiple of 11.4 for the same period. Revlon was characterized as the second largest company in the cosmetics industry after Avon and the largest among retail outlet distributors. Its products were marketed through seven distinct "houses", each aimed at a different market and price range. For example, Revlon marketed "Moondrops" through drug stores and department stores while its "Ultima II" product was marketed through high-end specialty and department stores. Revlon had expanded into the health care industry: by the end of 1976, sales of health care products accounted for almost 30 percent of its revenues. In 1976, its revenues were almost four times those of EJL and its net income was more than eight times that of EJL. Its net income margins were almost double those of EJL on both valuation dates, and its net income was growing at a compound annual rate of 21.3 *825 percent as compared with 18.8 percent for EJL. Revlon's earnings increased every year during the period 1972 through 1976. Revlon's diversification, broad distribution channels, and overall financial performance led Shutzer to conclude that EJL's price/earnings multiples would be at a very significant discount to Revlon's multiples of 15.8 and 17.2 for May 1974 and December 1976, respectively. Based on the above comparisons, Shutzer estimated that, if publicly traded, EJL would have been valued at multiples of 9 and 9.5 times its most recent earnings as of May 1974 and December 1976, respectively. Applying these multiples to EJL's earnings during the periods in question, Shutzer concluded that EJL common stock would trade in a public market for $ 2,025.18 and $ 2,727.15 per share as of May 1974 and December 1976, respectively. [12]Shutzer then discounted these share prices by 50 percent to reflect the lack of liquidity or marketability of the stock, yielding discounted share prices of $ 1,012.59 and $ 1,363.58 per share as of May 1974 and December 1976, respectively. *826 Shutzer also concluded that the "retention value" of EJL shares (the value to an investor holding the common stock for an indefinite time for dividend payments and appreciation) was not sufficiently high so as to affect the comparative valuation method. Shutzer acknowledged that the book value pricing formula set forth in the 1974 and the 1976 agreements probably would not generate a fair price for Estee Lauder's controlling interest in the company. In addition, although emphasizing that a book value pricing formula minimizes volatility in price swings, Shutzer conceded that investors in the "real world" generally use price/earnings ratios to value securities. 2. Yancey
Petitioner retained Dillon, Read & Co. Inc. (Dillon Read), to provide its opinion as to the proper discount for lack of liquidity or marketability to apply in valuing decedent's EJL stock. Richard C. Yancey (Yancey), a senior adviser with Dillon Read, participated in the preparation of the Dillon Read report and testified on behalf of petitioner at trial. Yancey attempted to estimate an appropriate discount by using dividend discount models. In an effort to quantify the discount, Yancey compared the *827 present value of a dividend stream normally paid by publicly traded cosmetics companies with the present value of a dividend stream paid by a private company (assumed to be 25 to 30 percent) reflecting the return required by investors providing venture capital. The model was intended to project the discount for lack of liquidity that a hypothetical purchaser of EJL common stock would demand to achieve various rates of return on his investment. The model produced discounts ranging from 67 to 96 percent. Yancey concluded that EJL stock would trade in the public market at a discount of 60 to 70 percent. [13] In reaching this conclusion, Yancey found it significant that: (1) EJL was highly leveraged relative to publicly traded companies in the cosmetics industry; (2) EJL's operating margins were lower than its competitors; (3) EJL was dependent on Estee and Leonard; and, (4) EJL limited the distribution network for its products. Yancey also emphasized that the hypo-allergenic rule posed a risk to Clinique products. *828 B. Respondent's Experts
1. Brockardt
Respondent retained Management Planning, Inc., a firm engaged in preparing financial analyses of closely held businesses, to value the EJL stock held by decedent as of the dates that the two shareholder agreements were executed. James W. Brockardt (Brockardt), a senior valuation analyst with Management Planning, Inc., participated in the evaluation of the EJL stock and testified on behalf of respondent at trial. Brockardt applied a comparative valuation method with a view towards determining appropriate multiples to apply in valuing the EJL stock. Brockardt restricted his guideline companies to those with publicly available financial statements and with common stock both publicly held and actively traded at prices above $ 5 per share. [14]
*829 For the May 1974 evaluation, Brockardt computed ratios reflecting price to book value, price to latest 4-year weighted average earnings, price to latest 4-year weighted average cash flow, price to latest year earnings, price to latest year cash flow, price to latest year dividends, and dividends to latest 4-year weighted average earnings. [15] Brockardt's December 1976 evaluation is based on similar ratios except that he applied 5-year weighted averages. Brockardt employed a multiyear approach to avoid placing undue emphasis on the financial results from a single year's operations and to reflect trends in sales, earnings, and cash flow. In comparing EJL to the guideline companies, Brockardt concluded that the relative size *830 of a company is not a significant factor, that EJL was not overly dependent on any key person, and that EJL's superior rate of return on equity counterbalanced any negative effect from its relatively lower net profit margins. Based on an article published in Advertising Age and republished in Drug & Cosmetics Industry in October 1975, Brockardt noted that EJL's total market share of cosmetics sold increased each year during the period 1970 through 1974. On the other hand, Brockardt acknowledged the trend towards one-stop shopping for cosmetics, increasing competition, and lower gross profit margins in the fragrance end of the cosmetics business as negative factors. Brockardt also admitted that he did not interview EJL management regarding its reliance on key executives. Brockardt computed an aggregate equity value in EJL by computing the median for each of the previously described valuation ratios and multiplying the financial results achieved by EJL by those median figures. Brockardt arrived at a public market value for the EJL common stock by subtracting the value of EJL preferred stock from the figure representing EJL's aggregate equity value. [16] On this basis, Brockardt *831 concluded that EJL common stock would trade in the public markets as reflected below: May 28, 1974
December 14, 1976
Voting
$ 4,014
$ 4,661
Nonvoting
3,823
4,439
Brockardt then discounted these amounts by 25 percent to reflect the stock's lack of liquidity or marketability, yielding discounted share prices as reflected below: May 28, 1974
December 14, 1976
Voting
$ 3,000
$ 3,500
Nonvoting
2,900
3,300
2. Reilly
Respondent retained Willamette Management Associates, Inc. (Willamette), an appraisal and financial consulting firm, to value the EJL stock held by decedent as of the dates that the two shareholder agreements were executed. Robert F. Reilly (Reilly), a managing director with Willamette, participated in the evaluation of the EJL stock and testified on behalf of respondent at trial. Reilly applied four valuation methods to value the EJL common stock: (1) The capital market approach; (2) the market *832 data transactional approach; (3) the adjusted net worth approach; and (4) the discounted net cash flow approach. [17] Reilly used 2-year and 4-year averages for 1974 and 1976, respectively, in analyzing the financial data of EJL and calculating valuation multiples. The following table reflects the value of a controlling equity interest in EJL derived from each of the four valuation methods utilized *833 by Reilly, including an overall average: Approach
May 28, 1974
December 14, 1976
Capital market approach
$ 157,000,000
$ 190,000,000
Market data transactional approach
240,000,000
292,000,000
Adjusted net worth approach
132,000,000
184,000,000
Discounted net cash flow approach
156,000,000
208,000,000
Average of four approaches (rounded)
$ 170,000,000
$ 210,000,000
Reilly reduced the above figures to reflect the estimated value of all EJL preferred stock. In addition, Reilly applied a 10-percent discount for lack of marketability and a 5-percent discount for key executive dependence. In light of decedent's minority interest in EJL at the time of his death, Reilly applied a 30-percent minority interest discount in valuing decedent's stock. Reilly arrived at this discount based on the reciprocal of the 40-percent control premium he attributed to the large block of shares held by Estee. Reilly also applied a 5-percent discount in computing the value of the nonvoting common stock held by decedent on the date of his death. On this basis, Reilly concluded that the decedent's EJL voting common stock would trade in the public markets at $ 2,632 and $ 3,261 as of *834 May 1974 and December 1976, respectively, and that decedent's EJL nonvoting common stock would trade in the public markets at $ 2,393 and $ 2,964 as of May 1974 and December 1976, respectively. Reilly acknowledged that EJL was more highly leveraged than the guideline companies and that its operating margins were relatively lower due to EJL's restricted distribution network and its heavy reliance on fragrance products. Reilly attributed EJL's relatively lower profit margins for the periods including 1974 and 1976 to the payment of royalties to Estee under the trademark agreement. Reilly erroneously believed that these payments were to end in 1979 so that there would be improvement in the profit margins thereafter. OPINION The issue for decision is whether the formula price contained in restrictive shareholder agreements, to which decedent was a party, controls the valuation of stock in a closely held corporation for purposes of the Federal estate tax. Sections 2031 and 2033 provide that the value of the gross estate includes the value of all property to the extent of the interest therein of the decedent at the time of his death. The relevant value is normally the fair market *835 value, which is "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." Sec. 20.2031-1(b), Estate Tax Regs.; United States v. Cartwright, 411 U.S. 546, 551 (1973). The determination of fair market value is a question of fact. Estate of Newhouse v. Commissioner, 94 T.C. 193, 2,, (1990); Estate of Gilford v. Commissioner, 88 T.C. 38, 50 (1987). If the property to be included in the gross estate is stock that is not listed on an exchange, and cannot be valued with reference to bid and asked prices or historical sales prices, the value of listed stock of corporations engaged in the same or a similar line of business should be considered. Sec. 2031(b). The courts, particularly the Court of Appeals for the Second Circuit to which this case is appealable, have long recognized that the value of corporate stock may be limited for Federal estate tax purposes by an enforceable buy-sell agreement or option contract which fixes the price at which the *836 stock may be offered for sale to the remaining shareholders. See May v. McGowan, 194 F.2d 396 (2d Cir. 1952); Lomb v. Sugden, 82 F.2d 166 (2d Cir. 1936); Wilson v. Bowers, 57 F.2d 682 (2d Cir. 1932); see also Commissioner v. Bensel, 100 F.2d 639 (3d Cir. 1938), affg. 36 B.T.A. 246 (1937). Such agreements are also recognized as restricting the value of partnership interests. Brodrick v. Gore, 224 F.2d 892 (10th Cir. 1955); Fiorito v. Commissioner, 33 T.C. 440 (1959); Estate of Weil v. Commissioner, 22 T.C. 1267 (1954). Several requirements have evolved for testing whether the formula price set forth in such restrictive agreements is binding for purposes of the Federal estate tax. It is axiomatic that the offering price must be fixed and determinable under the agreement. In addition, the agreement must be binding on the parties both during life and after death. See Wilson v. Bowers, supra at 683; see also *837 United States v. Land, 303 F.2d 170, 173 (5th Cir. 1962); Brodrick v. Gore, supra at 896; Estate of Matthews v. Commissioner, 3 T.C. 525, 528-529 (1944). Finally, the restrictive agreement must have been entered into for a bona fide business reason and must not be a substitute for a testamentary disposition. See sec. 20.2031-2(h), Estate Tax Regs.; Dorn v. United States, 828 F.2d 177, 181-182 (3d Cir. 1987); St. Louis County Bank v. United States, 674 F.2d 1207, 1210 (8th Cir. 1982); see also Slocum v. United States, 256 F. Supp. 753, 755 (S.D.N.Y. 1966). Petitioner contends that the formula price set forth in the shareholder agreements is controlling for purposes of determining the estate tax value of decedent's stock. Petitioner maintains that the shareholder agreements establish a fixed and determinable price for the stock, that the obligation to offer the stock to the remaining shareholders is binding both during life and at death, and that there is a bona fide business purpose for the *838 agreements. Petitioner argues that the formula reflects a fair, objective measure of the value of the stock, which approximated fair market value on the dates that the shareholder agreements were executed. Respondent concedes that the shareholder agreements establish a fixed and determinable selling price for decedent's stock. However, respondent contends that various transfers of EJL stock by the Lauders during the period in question reveal that the Lauders themselves did not consider the agreements binding. Respondent further contends that the formula price grossly undervalued the EJL stock on the dates the shareholder agreements were executed. Respondent argues that the formula price was derived without an appraisal of EJL, that the value of intangibles is not taken into account under the formula, that the parties to the agreements did not negotiate with respect to the formula, and that the agreements do not provide for a controlling interest premium with respect to the shares held by Estee. We are convinced that the shareholder agreements created enforceable obligations against decedent both during his life and after his death. See Wilson v. Bowers, supra at 683, *839 and cases cited therein. Moreover, we conclude that the Lauders considered the agreements to be binding, notwithstanding that EJL stock was transferred to nonshareholders both contemporaneously with and subsequently to the execution of the agreements. In particular, the Lauders executed formal waivers, consistent with the agreements, with respect to: (1) The 1976 stock swap between decedent and Leonard and Ronald; (2) the transfers of stock in trust for the benefit of the children of Leonard and Ronald; and (3) the transfers of shares to the University of Pennsylvania. In addition, each transferee was explicitly bound by the terms of the agreements. On the whole, we cannot agree with respondent that these transfers were inconsistent with the Lauders' intent to maintain family control over EJL. [18]
*840 Nor do we view the amendment of the agreement in 1986 allowing Ronald to continue to hold EJL common stock while serving as an ambassador to be particularly significant. In our view, the amendment reflects a reasonable reaction to an unforeseen contingency involving Ronald's desire to pursue public service. The foregoing aside, we are left to decide whether: (1) The restrictive shareholder agreements served a bona fide business purpose; and (2) the agreements were intended as a testamentary device to transfer decedent's stock to the natural objects of his bounty for less than adequate and full consideration. Specifically, section 20.2031-2(h), Estate Tax Regs., provides in pertinent part: Even if the decedent is not free to dispose of the underlying securities at other than the option or contract price, such price will be disregarded in determining the value of the securities unless it is determined under the circumstances of the particular case that the agreement represents a bona fide business arrangement and not a device to pass the decedent's shares to the natural objects of his bounty for less than an adequate and full consideration in money or money's worth. * * *
*841 Section 20.2031-2(h), Estate Tax Regs., was first adopted over 34 years ago. See T.D. 6296, 23 Fed. Reg. 4529 (June 23, 1958). Contrary to petitioner's position, the regulation requires not only that the agreement meet the business purpose prong of the test but also that the agreement not be a testamentary device. See St. Louis County Bank v. United States, supra; see also Dorn v. United States, supra at 182; Estate of Bischoff v. Commissioner, 69 T.C. 32, 41-42 (1977); Estate of Reynolds v. Commissioner, 55 T.C. 172, 194 (1970). In discussing the issue presented in this case, one commentator has observed that legitimate business purposes are often "inextricably mixed" with testamentary objectives where, as here, the parties to a restrictive stock agreement are all members of the same immediate family. 5 Bittker, Federal Taxation of Income, Estates and Gifts, par. 132.3.10, at 132-54 (1984). More specifically, it has long been recognized that restrictions placed on the transfer of stock in order to maintain exclusive *842 family ownership and control may serve a bona fide business purpose. Estate of Bischoff v. Commissioner, supra at 39-40; Estate of Littick v. Commissioner, 31 T.C. 181, 187 (1958); Slocum v. United States, 256 F. Supp. 753 (S.D.N.Y. 1966). At the same time, however, the family may achieve testamentary objectives to the extent that the agreement allows for the possibility (and generally the probability) that stock held by members of a more senior generation will be sold to subsequent generations (children and grandchildren) at a bargain price. Bittker, supra at 132-57 through 132-59. [19]
*843 With these considerations in mind, it is evident that intrafamily agreements restricting the transfer of stock in a closely held corporation must be subjected to greater scrutiny than that afforded similar agreements between unrelated parties. Dorn v. United States, 828 F.2d at 182; Harwood v. Commissioner, 82 T.C. 239, 259 (1984), affd. without published opinion 786 F.2d 1174 (9th Cir. 1986); Estate of Kelley v. Commissioner, 63 T.C. 321, 325 (1974); Estate of Tiffany v. Commissioner, 47 T.C. 491, 499 (1967); Hoffman v. Commissioner, 2 T.C. 1160, 1178-1179 (1943), affd. sub nom. Giannini v. Commissioner, 148 F.2d 285 (9th Cir. 1945) ("The fact that the option is given to one who is the natural object of the bounty of the optionor requires substantial proof to show that it rested upon full and adequate consideration."). Turning to the case at hand, there can be no question that the shareholder agreements, on their face, serve the legitimate business purpose of preserving *844 family ownership and control of the various Lauder enterprises. We are persuaded that these concerns were a motivating factor in the Lauders' decision to enter into the agreements. Respondent contends that lack of a business purpose is demonstrated by a comparison of the book value formula set forth in the disputed agreements with the earnings-based formula contained in the Worsfold agreement. Respondent asserts that the difference in the two formulas indicates that the Lauders were aware that the book value formula was not an appropriate means for the valuing the EJL stock. We are convinced that the Worsfold agreement was in substance a contingent $ 1 million bonus, and that Worsfold was not intended to hold the Hemisphere stock after the bonus was earned. In this regard, the Hemisphere stock was in fact redeemed in 1974 for $ 1 million to be paid over a period of time. Consequently, we are not convinced that the differences in the formulas alone support the proposition that the shareholder agreements lack a business purpose. Notwithstanding the business purpose for the agreements, petitioner also bears the burden of proving that the agreements were not intended as a device *845 to pass decedent's shares to the natural objects of his bounty for less than an adequate and full consideration in money or money's worth. Suffice it to say that Leonard's testimony that the agreements were not so intended is insufficient to satisfy petitioner's burden of proof on this most critical point. Davis v. Commissioner, 88 T.C. 122, 141, 144 (1987), affd. 866 F.2d 852 (6th Cir. 1989). Petitioner asserts that the agreements are not testamentary in nature on the grounds that: (1) Decedent was not in poor health or apprehensive of imminent death at the time the agreements were executed; (2) there was an interval of several years between the execution of the agreements and decedent's death; (3) the parties adhered to the terms of the agreements; and (4) any one of the Lauders could have predeceased the others. In contrast, there are compelling circumstances suggesting that decedent, who was in his seventies when the agreements were signed, entered into the agreements as a substitute for a testamentary disposition to pass on his interest in the business to the members of his family for less than adequate consideration. *846 We are most concerned with the arbitrary manner in which Leonard, an experienced businessman, adopted the adjusted book value formula for determining the purchase price of the stock under the agreements. Leonard admitted that he arrived at the formula without a formal appraisal and without considering the specific trading prices of comparable companies. Nor does it appear that Leonard obtained any significant professional advice in selecting the formula price. Leonard settled on the book value formula himself after consulting with Arnold M. Ganz (a close family financial adviser now deceased). Notably, there is no mention of Mr. Ganz in Leonard's affidavit submitted along with petitioner's original motion for partial summary judgment. We further note that Shutzer, petitioner's expert, declined to evaluate decedent's stock on the basis of book value because he did not believe that "real world" investors would value the stock in this manner. In arriving at the book value formula in 1974, Leonard testified that he considered that companies listed in the Standard & Poor's 400 generally traded for book value. Assuming that Leonard considered the Standard & Poor's 400, we find it *847 somewhat incredible that Leonard, as president and director of EJL, was unaware or overlooked the fact that the Standard & Poor's 400 indicated that the average price to book value ratio of cosmetic companies ranged between 2 to 1 and 3 to 1 during the period in question. We are also concerned by Leonard's testimony that he did not have EJL appraised out of anxiety over the confidentiality of EJL's financial statements. Such testimony seems contrived in light of the engagement of the Warburg investment banking group in 1975 for the purpose of investigating the feasibility of raising capital for the company through the private placement of $ 15 million in long-term notes. Although Leonard was evasive on the point, it is clear that in carrying out its "due diligence" investigation Warburg was privy to detailed financial information regarding EJL's operations and projected revenues. Further, Warburg was permitted to release a private placement memorandum to at least one insurance company before the Lauders withdrew from the transaction in 1976. No less significant is the fact that the record is devoid of any persuasive evidence that the Lauders negotiated with respect to the formula *848 price. To the contrary, the record indicates that Leonard unilaterally decided upon the formula price. Ronald could not remember who decided upon the formula and only recalled that Leonard had explained the formula to him. Estee had no specific recollection of either of the agreements. Given these circumstances, it appears that the parties never intended to negotiate the matter, fully recognizing that an artificially low price would provide estate tax benefits for all. [20]
As a final matter, we question the propriety of expressly excluding the value of all intangible assets from the book value formula. In our view, the cosmetics industry is somewhat unique in *849 that intangible assets, such as trademarks and trade names, represent a significant component of the aggregate value of total assets. Moreover, there can be no doubt that much of the value in EJL is attributable to the name "Estee Lauder" and to the goodwill generated over the years by virtue of the Lauders' creative and novel marketing of EJL products. This point is supported in the record by the fact that Estee was compelled to transfer the "Estee Lauder" trademark to EJL to enable the latter to negotiate for loans and other credit in the public market. Thus, while we appreciate that an adjusted book value formula may provide a simple and inexpensive means for evaluating shares in a company, we cannot passively accept such a formula where, as here, it appears to have been adopted in order to minimize or mask the true value of the stock in question. See Estate of Trammell v. Commissioner, 18 T.C. 662 (1952). Considering the foregoing factors in conjunction, an inference may fairly be drawn that the agreements were designed to serve a testamentary purpose. To finally resolve whether the agreements are binding for estate tax purposes, we turn to *850 the question of whether the price to be paid for decedent's stock under the agreements reflected adequate and full consideration in money or money's worth. With respect to the issue of the adequacy of the consideration, we begin with petitioner's alternative argument that: Mutual promises, made when any one of the shareholders could have predeceased the others, themselves provide full and adequate consideration for the Shareholder Agreement.
From petitioner's point of view, there is no need to demonstrate any nexus between the formula price and the fair market value of the subject stock. As articulated in our prior Memorandum Opinion, we fully appreciate the utility and merit of shareholder agreements in maintaining family ownership and control of business organizations. We agree that the mutual promises of the parties to a restrictive shareholders agreement generally provide full and adequate consideration for the agreement where the parties deal at arm's length. See, e.g., Cartwright v. United States, 457 F.2d 567, 571 (2d Cir. 1972), affd. 411 U.S. 546 (1973); Fiorito v. Commissioner, 33 T.C. 440, 446 n.1 (1959). *851 In particular, it can be assumed that unrelated parties will tend to negotiate a formula serving their best interests and reflecting a fair price. Where the parties to a restrictive shareholders agreement are truly unrelated and there is no indication that the agreement was intended as a testamentary device, there generally is no basis for respondent to seek to value the stock at a price higher than that paid under the agreement. See Estate of Seltzer v. Commissioner, T.C. Memo. 1985-519. In short, the gross estate will include the actual amount paid by the remaining shareholders to the deceased shareholder's estate. In contrast, the assumption that the formula price reflects a fair price is not warranted where, as here, the shareholders are all members of the same immediate family and the circumstances show that testamentary considerations influenced the decision to enter into the agreement. In such cases, it cannot be said that the mere mutuality of covenants and promises is sufficient to satisfy the taxpayer's burden of establishing that the agreement is not a testamentary device. Rather, it is incumbent on the estate to demonstrate that the *852 agreement establishes a fair price for the subject stock. Where the estate fails in its burden of proof and the Court finds that the restrictive agreement sets an artificially depressed price for the subject stock, it follows that the estate of the deceased shareholder will be required to pay additional Federal estate tax based on the fair market value of the stock as determined by the Court. In light of the circumstances present in the instant case, we must consider the adequacy of the consideration in terms of the price to be paid for decedent's stock as of the dates the agreements were executed. As previously indicated, petitioner maintains that the adjusted book value formula reflects a fair, objective measure of the value of the stock, which approximated fair market value on the dates that the shareholder agreements were executed. Respondent argues to the contrary. We have considered whether such formulas reflect full and adequate consideration in our prior cases. In particular, in Bensel v. Commissioner, 36 B.T.A. 246, 252-253 (1937), affd. 100 F.2d 639 (3d Cir. 1938), the Board of Tax Appeals (our predecessor) *853 concluded that an option price, negotiated between a father and son who at the time were estranged, was controlling for estate tax purposes. [21] The Board held that the option price was not lower than that which would have been agreed upon by persons with adverse interests dealing at arm's length. The Board concluded that the consideration was full and adequate in money or money's worth at the time the option contract was entered into. We followed the Bensel analysis in Estate of Bischoff v. Commissioner, 69 T.C. 32, 41 n.9 (1977). *854 In short, we rejected respondent's argument that the buy-sell agreement in question was merely a substitute for a testamentary disposition in part on the ground that the formula price to be paid for a partnership interest represented the fair market value of the assets of the partnership. Notably, the phrase "adequate and full consideration" is not specifically defined in section 20.2031-2(h), Estate Tax Regs. In defining the phrase, we begin with the proposition that a formula price may reflect adequate and full consideration notwithstanding that the price falls below fair market value. See, e.g., Estate of Reynolds v. Commissioner, 55 T.C. 172, 194 (1970). In this light, the phrase is best interpreted as requiring a price that is not lower than that which would be agreed upon by persons with adverse interests dealing at arm's length. Bensel v. Commissioner, supra.Under this standard, the formula price generally must bear a reasonable relationship to the unrestricted fair market value of the stock in question. With the foregoing in mind, we turn to the expert reports and the question of whether the book value *855 formula price reflected adequate and full consideration for decedent's stock on the date the shareholders agreements were executed. The opinion of an expert is admissible if it will assist the trier of fact in determining a fact in issue. See Fed. R. Evid. 702. However, we are not bound by any expert opinion that is contrary to our judgment. Helvering v. Nat. Grocery Co., 304 U.S. 282, 295 (1938); Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976), affg. T.C. Memo. 1974-285. We add the oft-repeated caveat that a question of value, such as that presented herein, is an inherently imprecise exercise and capable of resolution only by a Solomon-like pronouncement. Messing v. Commissioner, 48 T.C. 502, 512 (1967). Giving due consideration to each of the expert appraisals, and weighing all of the facts and circumstances presented, we conclude that Shutzer's earnings-based methodology provides the most reliable basis for valuing the EJL stock on the date the agreements were executed. [22] At the same time, we are not prepared to adopt Shutzer's appraisal outright, *856 nor have we disregarded the remaining reports in their entirety. [23]
*857 We agree with Shutzer that a comparative valuation approach, with an emphasis on the price/earnings ratios of industry competitors, is the most reliable basis for valuing the decedent's EJL stock on the dates the agreements were executed. Nonetheless, after considering EJL's relative position in the cosmetics industry, we are not convinced that Shutzer's price/earnings multiples of 9 and 9.5 provide an accurate measure for valuing the EJL stock. Market value is an implicit estimate of the growth and earnings prospects of the subject company. In our view, EJL's overall financial performance, with particular emphasis on its sales and income figures, generally compared favorably, during one or both of the valuation dates, with Faberge, Noxell, and to a lesser extent Mary Kay. In addition, EJL secured gains in market share of cosmetics sold during the period 1970 through 1976. There is no compelling evidence in the record that EJL's market share was expected to decline in the near future. To the contrary, Leonard declared in a 1975 interview that he expected EJL's sales and profits to "at least double in the next three to five years." We disagree with Shutzer's decision to treat *858 the Lauders' selective distribution strategy as a negative factor in his evaluation. To the contrary, much of EJL's success during the period in question is attributable to the goodwill arising from the name "Estee Lauder" and the Lauders' uncanny sense for how to best market their products. As previously indicated, the Lauders were very selective when deciding which individual stores within a retail chain would be permitted to sell EJL products. Once a new door was established, the Lauders were both aggressive and creative in marketing EJL products, using targeted mailings, gift-with-purchase promotions, and free demonstrations. The Lauders were industry leaders in this particular end of the market. While there may have been some movement towards one-stop shopping during the period in question, we are in no way convinced that this detracted from EJL's prospects for continued profitability and success. With the foregoing in mind, we conclude that EJL's operating performance and future earnings potential are best reflected in price/earnings multiples of 11 and 12.5 for May 1974 and December 1976, respectively. Next, we consider the proper discount for lack of liquidity or marketability *859 to apply in valuing the EJL stock. Both parties agree that such a discount is necessary. We view Yancey's 60-percent discount for lack of liquidity to be clearly excessive. At the same time, we cannot agree with Brockardt that a 25-percent discount is appropriate. Based on all of the circumstances, we conclude that a discount of 40 percent is appropriate. [24] Cf. Estate of Hall v. Commissioner, 92 T.C. 312, 326, 341 (1989); Estate of Gilford v. Commissioner, 88 T.C. 38, 61 (1987); Estate of Oman v. Commissioner, T.C. Memo. 1987-71; Estate of Gallo v. Commissioner, T.C. Memo. 1985-363. Applying these multiples and discounts to the earnings used in Shutzer's computation, we conclude that decedent's EJL *860 common stock would have sold for $ 1,485.13 and $ 2,153.02 per share as of May 1974 and December 1976, respectively. In contrast, the prices for the stock as determined in accordance with Article 6 of the agreements were $ 614.70 and $ 1,212.07 per share, as of May 1974 and December 1976, respectively. Comparing these two sets of figures, we are unable to conclude that the formula price reflects the price that would be negotiated between two unrelated parties. Consequently, we cannot agree with petitioner that the formula price reflects full and adequate consideration on the dates the agreements in question were executed. Considering all of the circumstances, particularly the arbitrary manner in which the formula price was selected, we conclude that the agreements were adopted for the principal purpose of achieving testamentary objectives. Thus, the formula price is not binding for purposes of valuing the EJL stock held by decedent on the date of his death. Estate of Reynolds v. Commissioner, 55 T.C. 172, 194 (1970), does not compel a different result. Simply stated, our comments comparing the formula price with market prices in that case followed *861 our holding that the formula price was not binding for estate tax purposes. Moreover, we were not focusing on the narrow question of whether the formula price reflected adequate consideration at the time the voting trust was adopted. Rather, we were specifically concerned with whether the formula price reflected a testamentary device given a dramatic rise in securities prices several years after the agreement was executed. Thus, we reject the notion that a formula price within 2-1/2 times the market price for the stock necessarily reflects adequate and full consideration in all cases. As a consequence of our holding that the formula price is not binding for purposes of the Federal estate tax, further proceedings will be necessary to determine the fair market value of the EJL stock held by decedent on the date of his death. Secs. 2031, 2033. While we do not here render the agreements invalid per se, we hold that for Federal estate tax purposes they have no viability and that the valuation provisions are, simply put, an artificial device to minimize such taxes. To reflect the foregoing, An appropriate order will be issued. Footnotes
1. Unless otherwise indicated, section references are to the Internal Revenue Code in effect as of the date of decedent's death, and Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Pipelining involves shipping a 3-month supply of inventory when a new door is opened or a new product introduced. Thus, if a new door is opened in July, sales reflected for the month will be the sales for 1 month plus a 3-month supply of inventory.↩
3. Worsfold is not related by blood or marriage to the Lauders.↩
4. Petitioner was unable to locate any minutes of ELI's board of directors relating to the adoption of the 1974 agreement.↩
5. Serving as a director is considered employment under the agreement.↩
6. There is no mention of Leonard's consultation with Arnold M. Ganz in Leonard's affidavit submitted in support of petitioner's motion for partial summary judgment filed on Oct. 4, 1988.↩
7. The waiver document in the record does not contain a signature on behalf of ELI.↩
8. The 1976 agreement states that in deciding whether to consent to a transfer to a nonshareholder, EJL should consider the Lauders' intention to maintain EJL as a family business and to prevent stock transfers to a competitor.↩
9. Under the 1963 wills, neither decedent nor Estee Lauder named the other as a beneficiary.↩
10. The parties stipulated that as of June 30, 1982, and June 30, 1983, the purchase prices per share of EJL common stock, determined in accordance with Article 6 of the 1976 agreement, were $ 4,300.32 and $ 4,971.83, respectively.↩
11. Shutzer rejected using certain other valuation ratios. In particular, he rejected the total-net-capitalization-to-net-revenue ratio on the ground that it completely fails to reflect a company's fundamental operating characteristics such as cost structures, margins, profitability risks, and industry trends. Although he recognized that the market-price-to-book-equity ratio produces a rough range of values for the net assets of a company, he declined to apply the ratio in appraising EJL because he did not think "real world" investors would consider such a ratio. Finally, Shutzer asserted that the total-net-capitalization-to-operating-profit/cash flow ratio should not be applied in appraising EJL because the ratio fails to take into account the cash flow needs of the particular industry.↩
12. Shutzer utilized EJL's earnings figures of $ 7,855,000 and $ 10,021,000 for the fiscal years ending June 30, 1974, and June 30, 1976, respectively, which he considered the best available information for the evaluation.↩
13. Yancey referred to the following articles and studies involving unregistered stock of publicly traded companies: (1) Moroney, "Most Courts Overvalue Closely Held Stocks", 51 Taxes 144 (March 1973) (reflecting an average discount of 36 percent); (2) Emory, "The Value of Marketability as Illustrated in Initial Public Offerings of Common Stock", Business Valuation News 21 (Sept. 1985) (reflecting an average discount of 60 percent); (3) Maher, "Discounts for Lack of Marketability for Closely Held Business Interests", 54 Taxes 562 (Sept. 1976) (reflecting an average discount of 35 percent); and (4) Pittock and Stryker, "Revenue Ruling 77-287↩ Revisited", SRC Quarterly Reports (Spring 1983) (reflecting a median discount of 45 percent). Yancey did not consider the particular facts underlying the transactions referred to in the Moroney study nor whether they were at arm's length. Similarly, he did not examine the financial condition of any of the companies referred to in the Emory or Maher studies. The data in the Emory study concerned a comparison of initial public offering prices and private-insider transactions within 5 months of the initial offering.
14. Brockardt selected the following companies for comparison with EJL for the May 1974 evaluation: Alberto-Culver Company (Alberto-Culver); Avon; Ponds; Del; Faberge; MEM; Mary Kay; Neutrogena Corp. (Neutrogena); Noxell; Redken Laboratories, Inc. (Redken); and Revlon. Brockardt selected the same guideline companies, adding Helene Curtis to the list, for the December 1976 evaluation.↩
15. Brockardt gave greater weight to the financial data based on total years of data available and the chronological proximity of the data year to the valuation date. Using this approach, he assigned a weight (or multiplier) of one to the data for 1972 up to a weight of five for the 1976 data.↩
16. Brockardt assumed a 5-percent premium attributable to the voting stock.↩
17. Reilly's capital market valuation is similar to the methods applied by both Shutzer and Brockardt. Under this approach, Reilly selected 15 publicly traded companies as guideline valuation indicators. The market data transactional approach involves a comparison of merger and acquisition transactions within the cosmetics and fragrances industry. The adjusted net worth valuation approach is a balance sheet oriented methodology focusing on the value of income-producing assets. The discounted net cash flow approach emphasizes projected net cash flows in conjunction with a calculation of the residual value of the firm.↩
18. Respondent contends that the transfer of stock to the University of Pennsylvania was inconsistent with the Lauders' desire to maintain family control. Specifically, respondent argues that the University could have held its shares until the death of each of the parties to the agreement, thereby gaining outright control of EJL. Although respondent's argument may apply in theory, we cannot agree that such a plan would have been in the University's best interests. Indeed, the University opted in 1981 to have its stock redeemed pursuant to the terms of the agreement in effect at that time.↩
19. It is often the case that the formula price set forth in such restrictive agreements reflects a price below fair market value. See Estate of Reynolds v. Commissioner, 55 T.C. 172, 194 (1970); Fiorito v. Commissioner, 33 T.C. 440, 442-443 (1959); Estate of Littick v. Commissioner, 31 T.C. 181, 186↩ (1958); 5 Bittker, Federal Taxation of Income, Estates and Gifts, par. 132.3.10, at 132-54 (1984).
20. Presumably, if decedent and Estee were pursuing an identical agreement with unrelated parties in the place of Leonard and Ronald, they would have been motivated, by virtue of their advanced age, to negotiate a formula ensuring as high a price as possible for their shares balanced against their desire to maintain continuity of management and control.↩
21. In Bensel v. Commissioner, 36 B.T.A. 246, 252-253 (1937) affd. 100 F.2d 639↩ (3d Cir. 1938), the father and son were hostile to one another. The father granted the son an option to buy his stock, exercisable upon the father's death, as an inducement to retain the son (considered a valuable employee) in the corporation's employ. There is no comparable evidence of arm's length dealing here.
22. The reports submitted by Brockardt and Reilly contain errors and as a consequence are not trustworthy. Brockardt appears to have erroneously eliminated certain tax provisions in computing EJL's earnings and cash flow for 1974 and 1976. He also ignored EJL's working capital needs in estimating its dividend paying capacity. Reilly's overall methodology is not persuasive. In applying the capital market approach, he failed to qualitatively compare EJL with the guideline companies, including differing tax rates, degrees of leverage, and net operating margins. Under the market data transactional approach, Reilly used data from four acquisitions of cosmetics companies which predated the 1974-75 recession.↩
23. It is worth noting that in analyzing the general economy, Shutzer represented that there were certain negative economic indicators by November of 1976 relying on an untitled "article" in the November 29, 1976, issue of Barron's. We found that the quote relied on came instead from an editorial commentary entitled "How's Business? Not as Bad as the Misleading Indicators Suggest". The editorial commentary does not provide sufficient information to support Shutzer's representation. Further, characterizing it as an article without providing us with a title appears to be misleading.↩
24. Shutzer's appraisal, which we have used as a guide, appears to include consideration of the discount for key person dependence. Thus, no additional discount for this factor is necessary.↩